618 S.E.2d 650 (2005)
274 Ga. App. 758
BOUVÉ & MOHR, LLC,
v.
BANKS.
No. A05A0687.
Court of Appeals of Georgia.
July 14, 2005.
Reconsideration Denied July 28, 2005.
*651 Thomas Carlock, Mary Greene, Renee Little, Carlock, Copeland, Semler & Stair, Atlanta, for appellant.
James Goldstein, Jonathan Hayes, Atlanta, for Appellee.
PHIPPS, Judge.
Joceyline Banks sued Bouvé & Mohr, LLC (B & M), the owner of the apartment complex where she lived, alleging that she had been raped and robbed in her apartment because B & M had negligently failed to repair a broken windowpane through which the intruder had gained entry. In its answer and discovery responses, B & M denied that Banks had been raped. After learning that evidence relevant to the alleged rape had been destroyed at the direction of the investigating police officer, Banks moved for spoliation sanctions against B & M, asserting that the officer had acted as its agent. Both Banks and B & M's counsel sought attorney fees incurred in litigating the spoliation issue. The trial court found that B & M was responsible for the spoliation and therefore ordered that the jury would be instructed at trial that Banks had been raped. The court denied as premature, however, the requests for attorney fees. B & M appeals, arguing that the spoliation sanctions were not justified and that the court should have granted its fee request. We granted interlocutory review and now affirm the trial court's grant of spoliation sanctions but remand for prompt consideration of B & M's attorney fees request.
Although the court did not conduct an evidentiary hearing on the spoliation claim, undisputed facts relevant to the issue were before the court based on deposition testimony and other evidence developed during pre-trial discovery. The record shows the following:
After Banks reported to the East Point Police Department (Department) that she had been raped at knife point in her apartment on February 3, 2001 by an unknown *652 intruder, a Department officer took her to the Rape Crisis Center at Grady Hospital, where she was examined and rape kit evidence was collected. On February 5, Banks informed B & M of the attack and "further stated that she could no longer remain in [her] apartment because of what had happened there." B & M agreed to refund her rent and security deposit on the condition that she sign a document releasing B & M from liability for any claims related to the rape. Banks signed the document on February 6, 2001, three days after the alleged rape, but repudiated it shortly thereafter through her attorney.
At the time of the alleged rape, B & M employed off-duty Department officers as security guards at the apartment complex. One such officer was Detective Robert Gray, who was assigned by the Department to investigate Banks's rape complaint. Gray closed the investigation on February 18, 2001, citing lack of interest on Banks's part.[1] He put a note in the file stating that the case could be reopened if Banks later contacted the Department.
On March 9, 2001, Banks sued B & M, alleging that its negligent failure to repair the broken windowpane permitted access to her apartment and was a proximate cause of the rape. Before filing suit, Banks's attorneys notified the Department by letters on February 22, 2001 and March 5, 2001 that Banks intended to file a civil suit as a result of the rape and asked that all evidence related to the rape be preserved. After the suit was filed, both Banks and B & M tried to subpoena the rape kit from Grady Hospital, but neither side was successful because the kit was in the possession of the Rape Crisis Center (Crisis Center), a separate entity from the affiliated hospital.
On July 25, 2002, Crisis Center employee Paulette Barnes wrote to the Department stating that the Crisis Center had Banks's rape kit and that the Department could pick it up if Banks was "planning on filing charges for the incident." Barnes testified by affidavit that, shortly after she sent the letter, she began receiving telephone calls from a B & M attorney asking for the rape kit. Barnes responded that she would release the kit only to the police, and she then called the Department to ask if they planned to pick it up. On August 22, 2002, Gray picked up the kit from the Crisis Center.[2] At his deposition on September 9, 2002, Gray testified that the rape kit was then in the Department's possession.
On October 15, 2002, B & M filed a motion asking the trial court to order that the rape kit and other crime scene evidence in the Department's possession be tested by the Georgia Bureau of Investigation (GBI). Banks opposed the motion, arguing that the Department had closed its investigation of the rape case; that it had a conflict of interest because Gray had worked as an off-duty security guard for B & M; and that, in any event, the rape kit had already been analyzed by Grady Hospital. Accordingly, Banks asked the court to deny B & M's motion and to order that the rape kit and other crime scene evidence held by the Department be given to her.
Before the trial court ruled on these motions, deposition testimony revealed that the Department had destroyed Banks's rape kit. At his January 2003 deposition, Department Lieutenant Edward Bradley testified that, on or about November 13, 2002, he had taken the rape kit from the Department evidence refrigerator and destroyed it at Gray's direction. According to Bradley, as part of his yearly practice of cleaning out and disposing of unneeded evidence in closed cases, he had asked the Department detectives to give him the status of cases for which evidence was being held in the refrigerator. Gray informed *653 him that the Banks case was closed and her rape kit could be destroyed.
Bradley also testified that Department records showed that on February 3, 2001, evidence collected at the Banks crime scene had been logged in at the Department, including bedding from the apartment and a white washcloth, which Banks said was used to wipe her genital area after the rape. After examining the logged-in evidence, Bradley confirmed that the white washcloth was missing. According to Bradley, after evidence is logged in, only he and the Department Chief can access the evidence storage area. Bradley testified that he did not know where the washcloth was, that he had not destroyed it, and that Department records did not reflect that anyone had removed it from the storage area or destroyed it.
Gray was deposed again in January 2003. He testified that he logged the rape kit into evidence at the Department the same day he got it from the Crisis Center in August 2002. He further testified that immediately after his first deposition in September 2002, a B & M attorney asked him to check with the GBI to determine if it would process the rape kit. Gray agreed, even though there was no law enforcement reason for the kit to be processed. Thus, Gray testified, at his request another detective removed the kit from the Department's evidence refrigerator in November 2002 and took it to the GBI, but the GBI refused to process evidence from a closed case. According to Gray, the kit was then returned to the Department, and he called B & M's lawyers to report that the GBI would not process it.
Contrary to Gray's testimony, Department log-in records do not show that the rape kit was logged in in August 2002. The first time the Department records show the kit being logged in is November 13, 2002. Gray testified that he did not know why the records do not reflect an earlier log-in date.
Gray confirmed that the rape kit had been destroyed at his direction in November 2002 after he had received a memo from Bradley about the status of cases with stored evidence. Gray testified that he thought Banks had lost interest in the case and that there was no reason to preserve the rape kit. He admitted that he had not checked whether a request had been made to preserve evidence related to the Banks case before he directed Bradley to destroy the rape kit. As to the missing washcloth, Gray testified that he had heard it was missing from evidence, but that he had never seen it and had not removed it from evidence.
Finally, Gray stated that, although he might have spoken directly to someone from B & M about his criminal investigation of Banks's rape complaint, he did not talk to anyone at B & M about her civil suit. He also denied that anyone told him to destroy the rape kit or that he acted as an agent for B & M or its attorneys when he ordered its destruction.
Shortly after Gray's second deposition, Banks filed a motion requesting that B & M's answer in the case be stricken and judgment on the issue of liability be entered in her favor due to the "deliberate, intentional, and willful spoliation of evidence by Detective Gray, while acting as the agent of the Defendant." At oral argument on the motion, Banks contended that the evidence developed during discovery in the case showed that B & M and its attorneys acted in concert with Gray to manipulate and destroy evidence. Banks argued that the evidence showed that Gray, who moonlighted as a security guard for B & M and therefore had a conflict of interest, prematurely shut down the criminal investigation, used his police identity to obtain the rape kit from the Crisis Center, personally held it for three months, then signed it into evidence at the Department and ordered its destruction. According to Banks, the only logical conclusion that could be drawn from this evidence, and from other evidence of contact between Gray and B & M's attorneys, was that they had acted together to secretly analyze the rape kit for B & M and that they "knew it supported the plaintiff's claims, and it wasn't going to be beneficial for them [for it] to see the light of day."
Based on the oral argument and the discovery record, the trial court entered an order finding that Gray had operated under a conflict of interest by investigating the rape *654 case while he worked for B & M; that his unwholesome motives were clear from his closure of the criminal case after investigating for merely 15 days and making "[l]ittle or no effort . . . to contact the victim"; that he had picked up the rape kit from the Crisis Center and personally held it for three months; that he had acted wilfully and in bad faith by ordering the destruction of the kit with full knowledge of the pending civil case and of Banks's desire to obtain the kit; that the destruction of the washcloth also "circumstantially lay[ ] at the foot of Detective Gray" because he had access to it; and that the destruction of the rape kit undermined Banks's ability to prove that she had been raped. Thus, the court concluded that the record showed "a deliberate intent by an agent of [B & M] to destroy or compromise the integrity of evidence." The court found, however, that "there is no evidence before the Court that [B & M's] counsel participated in the spoliation of evidence."
With regard to a remedy for the spoliation, the court noted that although the evidence of spoliation authorized "dismissal of [B & M's] answer," it would not take that step. Instead, the court ordered that the jury would be instructed at trial that Banks had been raped and that B & M would be precluded from arguing otherwise. The court did not address the requests for attorney fees, finding that they were premature.
1. B & M argues that the trial court abused its discretion by impermissibly finding that Gray served as its agent when he destroyed evidence in bad faith. According to B & M, such factual determinations are for the jury. We disagree.
Trial courts have the power to control the behavior of litigants before them to maintain the integrity of the judicial process, and this power includes the discretion to fashion appropriate remedies for the spoliation of evidence.[3] "Spoliation refers to the destruction or failure to preserve evidence that is necessary to contemplated or pending litigation."[4] Sanctions may be imposed against a litigant based on a third party's spoliation of evidence if the third party acted as the litigant's agent in destroying or failing to preserve the evidence.[5] We will not disturb a trial court's imposition of sanctions for evidence spoliation unless the court abused its discretion.[6] Moreover, we will uphold a trial court's finding of wilful discovery abuse if there is any evidence to support it.[7]
In determining whether to impose sanctions for evidence spoliation, trial courts routinely and necessarily make factual findings about whether spoliation occurred, whether the spoliator acted in bad faith, the importance of the compromised evidence, and so on.[8] Spoliation issues often arise before trial, and sanctions for spoliation may include the removal of certain evidence and issues from the jury's consideration.[9] The trial courtnot the jurydetermines what evidence the jury may hear and which issues it must resolve. Therefore, the court did not exceed its authority in this case by making factual findings necessary to determine whether to impose sanctions for spoliation.
Moreover, the trial court did not abuse its discretion in concluding that the spoliation was attributable to B & M because Gray acted as B & M's agent. An agency relationship exists where one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf.[10] An agency relationship may be proven by circumstantial evidence of the conduct of the parties.[11] In *655 this case, the record contains circumstantial evidence that Gray acted as B & M's agent in destroying or compromising the rape kit.
Gray worked for both B & M and the Department. As early as three days after the alleged rape, B & M was concerned enough about potential legal liability to ask Banks to sign a release. Although Gray was assigned to investigate Banks's rape complaint, he closed the investigation after only 15 days. Approximately 17 months later, the Crisis Center notified the Department that it had the rape kit. Shortly thereafter, Barnes (the Crisis Center employee) received telephone calls from a B & M lawyer requesting the rape kit. A reasonable inference from the timing of these events is that Gray informed B & M or its lawyers that the Crisis Center had the rape kit.
Gray picked up the rape kit in person from the Crisis Center in August 2002, even though the criminal case had long been closed. Because Gray had no police purpose for retrieving the rape kit, it was reasonable for the trial court to conclude that he did so on behalf of B & M for use in the pending civil suit. Although Gray testified that he logged the rape kit into storage at the Department the day he obtained it from the Crisis Center, Department records do not show that the kit was logged in until November 13, 2002. In light of this discrepancy, the trial court was justified in concluding that Gray kept the rape kit in his personal custody for nearly three months. Because personal retention of evidence violated Department policy, and because the rape kit was not needed in a criminal case, it is reasonable to infer that Gray kept the rape kit on behalf of B & M.
Gray admitted that a B & M lawyer asked him to check whether the GBI crime lab would process the rape kit. Gray agreed to do so, even though he conceded that there was no law enforcement reason for the kit to be processed. Thus, the only logical purpose that Gray could have had for contacting the GBI was to assist B & M. After the GBI refused to process the kit, Gray notified B & M's lawyers of that fact. He then logged the kit into evidence at the Department and, shortly thereafter, ordered that it be destroyedeven though Banks's lawyer had asked the Department to preserve all evidence relevant to the rape.
Applying our necessarily deferential standard of review, we find that the trial court's determination that Gray acted as B & M's agent is supported by circumstantial evidence in the record that excludes other reasonable explanations for his behavior. We therefore affirm the court's conclusion that sanctions were warranted against B & M for its agent's spoliation of evidence.
2. B & M also argues that the court lacked discretion to "enter a finding of rape" as a sanction for the spoliation.
First, B & M argues that sanctions were not justified because Banks failed to show that the destruction of the evidence prejudiced her case.[12] But B & M has taken the position, in its answer and discovery responses, that Banks was not raped, thereby forcing her to prove that fact at trial. The rape kitits mere existence, as well as any tangible evidence it might have yieldedwas a critical piece of evidence that could have helped Banks prove that she had been raped. As the trial court found, the destruction of the kit hampered her ability to prove her case.[13]
Second, B & M argues that, in imposing a sanction, the court was limited to one of the three sanctions expressly enumerated in our case law: "(1) charg[ing] the jury that spoliation of evidence creates the rebuttable presumption *656 that the evidence would have been harmful to the spoliator; (2) dismiss[ing] the case; or (3) exclud[ing] testimony about the evidence."[14] But the trial court has wide latitude to fashion sanctions on a case-by-case basis, considering what is appropriate and fair under the circumstances.[15] We did not intend for the list cited by B & M to be exhaustive.
Third, B & M contends that the sanction in this caseinstructing the jury that Banks had been raped and prohibiting B & M from arguing otherwisewas too drastic. We disagree. After finding that evidence had been spoiled wilfully, in bad faith, and to Banks's detriment, the court essentially removed from the jury's consideration the issue to which the evidence related. Far from being the critical issue in the case, as B & M asserts, the question of whether Banks was raped is merely one element of her tort claim. And despite denying in its answer and discovery responses that she was raped, B & M's lawyer told the trial court:
As far as whether there was or was not a rape, that issue was raised by plaintiff's counsel . . ., not us. We didn't raise it as a defense. I'm certainly not going to stand in your courtroom and cross-examine Joceyline Banks as to whether or not she was raped. . . . I don't have any facts to support it.
It can hardly have been unfair for the trial court to prevent B & M from making an argument that its lawyer claimed it did not intend to make.
3. B & M also claims that the trial court erred by failing to grant its OCGA § 9-15-14(b) motion for the award of attorney fees, even though the court had expressly found that there was no evidence that B & M's attorneys had participated in the spoliation of evidence. The trial court did not consider the merits of the motion, but denied it as premature.[16]
Although a prior version of OCGA § 9-15-14 provided that motions for attorney fees under the Code section were premature if brought prior to "final disposition of the action," the Code section was amended in 1994 and now provides that attorney fees and expenses under the Code section "may be requested by motion at any time during the course of the action but not later than 45 days after the final disposition of the action."[17] Accordingly, the trial court erred by denying the motion as premature, and on remand the trial court is directed to address the merits of the motion.
Judgment affirmed in part and reversed in part, and the case remanded with directions.
RUFFIN, C.J., JOHNSON, P.J., BLACKBURN, P.J., and BARNES and MIKELL, JJ., concur.
ANDREWS, P.J., concurs in part and dissents in part.
ANDREWS, Presiding Judge, concurring in part and dissenting in part.
In her suit for damages against Bouvé & Mohr, LLC d/b/a Creekside and/or Spring Valley Apartments (B & M), Joceyline Banks alleged that she was raped and robbed in the apartment she rented from B & M, and that B & M was liable because it negligently failed to repair a windowpane through which the intruder gained entry to the apartment. B & M brought an interlocutory appeal from a pre-trial order on Ms. Banks's motion for sanctions against B & M for spoliation of evidence. In its order granting the motion, the trial court: (1) found that a police officer assigned to investigate Ms. Banks's rape and robbery complaint deliberately and in bad faith destroyed "rape kit" and other evidence relevant to the rape allegation while secretly acting as the agent of B & M, and (2) ordered that B & M be sanctioned at trial for spoliation of the evidence by an instruction to *657 the jury conclusively establishing that Ms. Banks was raped. The majority affirms this order finding that the record supports the trial court's conclusion that the police officer destroyed evidence acting as B & M's agent. Because there is no evidence in the record, direct or circumstantial, which could support the trial court's conclusion that the police officer destroyed evidence acting as B & M's agent, I respectfully dissent.
I concur with the majority's conclusion that the trial court erred by denying as premature B & M's motion for the award of attorney fees under OCGA § 9-15-14(b).
After Ms. Banks reported to the East Point Police Department (the Department) that she had been raped and robbed in her apartment on February 3, 2001, a Department officer took Ms. Banks to the Grady Hospital Rape Crisis Center (the Crisis Center) where rape kit evidence was collected. The Department then assigned Detective Robert Gray to investigate Ms. Banks's rape and robbery complaint. At the time, B & M employed off-duty Department officers as security guards at the apartments where Ms. Banks lived, and Detective Gray was one of the officers who had worked for B & M in that capacity. Detective Gray twice interviewed Ms. Banks about the alleged rape, obtained a description of the rapist, and, based on this information and further investigation, identified two suspects and developed a photo lineup as to each suspect for Ms. Banks to view. But Ms. Banks never viewed the lineups. Detective Gray testified that he made three separate attempts to personally contact Ms. Banks at home, leaving his business card each time, and that he also attempted to contact her by telephone and left messages for her with her fiancé and her brother. Ms. Banks testified that she was not aware of any messages left for her, and that she never had any further contact with the Department about her complaint. On February 18, 2001, Detective Gray put a note in his investigation file indicating that he was closing the file due to lack of interest from Ms. Banks, subject to the file being reopened if she contacted the Department. On March 9, 2001, Ms. Banks sued B & M for damages claiming that B & M's negligence proximately caused the rape and robbery.
During discovery in the civil suit, evidence revealed that the Department destroyed the rape kit in November 2002 during the Department's yearly purge of evidence in closed cases, and that at some point the Department lost a washcloth which had been collected as rape related evidence at Ms. Banks's apartment. In January 2003, Ms. Banks filed a motion seeking sanctions for spoliation of this evidence in which she alleged that evidence developed during the discovery process showed a "deliberate, intentional, and willful spoliation of evidence by Detective Gray, while acting as the agent of [B & M]." During oral argument on the motion, Ms. Banks contended the evidence showed that B & M and the attorneys for B & M acted in concert with Detective Gray to destroy the evidence. Pointing to evidence of contact between B & M's attorneys and Detective Gray, and the fact that Detective Gray along with other Department officers had worked off-duty as security guards at the B & M apartments, Ms. Banks made the following allegations: that Detective Gray had a conflict of interest because he had worked off-duty as a security guard at the B & M-owned apartments, and that he prematurely closed the Department investigation file on her complaint; that Detective Gray, acting on behalf of B & M, used his police identity to obtain the rape kit evidence from the Crisis Center in August 2002; that Detective Gray then personally held the rape kit for B & M for three months while B & M had it secretly analyzed during that time; that Detective Gray then logged in the rape kit at the Department in November 2002, and, acting on behalf of B & M, directed that the rape kit be destroyed by the Department as unwanted evidence in the closed investigation. Ms. Banks argued at the hearing on her sanctions motion that "[t]he only answer that we can come up with to that is that . . . [B & M] had [the rape kit evidence] analyzed, that they knew it supported the plaintiff's claims, and it wasn't going to be beneficial for them [for the rape kit] to see the light of day."
The trial court did not conduct an evidentiary hearing on the spoliation claim, but *658 based its consideration of Ms. Banks's claim entirely on the record developed during discovery in the case. As previously set forth, the record showed that Detective Gray, who had worked as an off-duty security guard for B & M, was assigned by the Department to investigate Ms. Banks's complaint, and that he interviewed Ms. Banks, investigated the case, located suspects, and developed photo lineups of the suspects for Ms. Banks to view. Although Detective Gray testified that he made numerous attempts to contact Ms. Banks to view the lineups, the record shows that Ms. Banks never responded and never contacted the Department to pursue her complaint. After Detective Gray closed the investigation file, subject to further contact from Ms. Banks, Ms. Banks filed the subject suit on March 9, 2001 seeking damages against B & M. Prior to filing the suit, Ms. Banks's attorneys asked the Department by letter to preserve evidence related to the rape.
The discovery record considered by the trial court further showed the following: After the rape kit evidence was collected at the Crisis Center from Ms. Banks on February 3, 2001, the rape kit remained in the possession of the Crisis Center for about 18 months while attorneys for both B & M and Ms. Banks unsuccessfully attempted to obtain the kit by subpoena. The Crisis Center eventually sent a letter to the Department on July 25, 2002 indicating that it still had the rape kit, and in response to the letter the Department sent Detective Gray to pick up the rape kit on August 22, 2002. A Crisis Center employee testified by affidavit that, after the letter was sent, she told an attorney for B & M, who was seeking possession of the rape kit, that the Crisis Center would only release the kit to the Department. Detective Gray testified by deposition that he logged in the rape kit at the Department on the same day he obtained it from the Crisis Center in August 2002, and that the rape kit remained in the custody of the Department until it was logged out for transport to the GBI in November 2002 to determine if the GBI would analyze it. At his January 2003 deposition, Detective Gray testified that, immediately after his earlier September 2002 deposition, an attorney for B & M asked him if he would determine if the GBI would analyze the rape kit. He testified that he told the B & M attorney that he would forward the rape kit to the GBI to determine if they would analyze it. According to Detective Gray, the GBI refused to analyze the rape kit because the Department investigation file was closed, and it was returned to the Department and logged in by him on November 13, 2002. Although Detective Gray testified that he called B & M's attorneys to inform them that the GBI would not analyze the rape kit, he said he did not otherwise discuss the rape kit with the B & M attorneys.
Detective Gray further testified that, shortly after the rape kit was returned to the Department from the GBI, the Department destroyed it at his direction as part of the Department's yearly purge of unneeded evidence in closed investigations. Detective Gray testified that the rape kit was destroyed at his direction in response to a memo he received from Department Lieutenant Edward Bradley about the status of cases with stored evidence. Lieutenant Bradley testified by deposition that, on or about November 13, 2002, he took the Banks rape kit from the Department evidence refrigerator and destroyed it at the request of Detective Gray, who had sent him written notice that the Banks investigation was closed and that the evidence could be destroyed. Lieutenant Bradley testified that it was his yearly practice to dispose of evidence in closed cases, and that the written notice he received from Detective Gray was sent in response to his request for information on the status of evidence in closed cases. Detective Gray testified that he authorized destruction of the rape kit because he thought Ms. Banks had lost interest in the case and that there was no reason to keep the evidence. He admitted that he did not check to determine if Ms. Banks had requested that the Department preserve the evidence prior to telling Lieutenant Bradley to destroy it.
Although Department records showed the November 13, 2002, log-in date, there were no Department records to support Detective Gray's testimony that he originally logged in the rape kit in August 2002 or that the rape kit was logged out in November 2002 for *659 transport to the GBI. Detective Gray testified that he did not know why the Department records failed to show those dates. Detective Gray testified that, although it was possible he spoke directly to someone connected to B & M during his criminal investigation of Ms. Banks's complaint, he had no conversations with anyone at B & M concerning Ms. Banks's civil suit against B & M. He also denied that anyone told him to destroy the rape kit, or that he acted as an agent for B & M or its attorneys when he told Lieutenant Bradley that the rape kit could be destroyed.
The record also shows that the Department lost a washcloth collected as rape evidence at Ms. Banks's apartment. Lieutenant Bradley testified that Department records showed that evidence collected at Ms. Banks's apartment was logged in at the Department, including bedding from the apartment and a washcloth, which Ms. Banks said was used to wipe her genital area after the rape. Lieutenant Bradley confirmed that the washcloth was missing from the logged-in evidence. According to Lieutenant Bradley, after the evidence was logged in, only he and the Department Chief had a key that could access the evidence storage area. Lieutenant Bradley testified that Department records did not show that the washcloth had been logged out or destroyed. Detective Gray testified that, although he had heard the washcloth was missing from evidence, he never saw it and did not remove it from evidence.
Based on the above discovery record in the case, the trial court entered an order in which it found that "there is no evidence before the Court that [B & M's] counsel participated in the spoliation of evidence." Nevertheless, the trial court concluded that evidence showed Detective Gray terminated the criminal investigation without good reason; that he picked up and personally held the rape kit from August 22, 2002 until November 13, 2002, and that "[t]he records show no reason as to why Detective Gray would hold such a critical piece of evidence in his possession for almost three months." The trial court further found that Detective Gray had "an obvious conflict of interest" because of his off-duty work for B & M, and that "[f]rom the very beginning Detective Gray's motives were clear when he concluded that this incident was not a rape case and closed it . . . with virtually little or no investigation." Moreover, the trial court found that Detective Gray, who had been deposed in Banks's civil case in September 2002 about two months before he directed that the rape kit be destroyed in November 2002, had notice that the evidence was important to Banks's civil case, and that he deliberately destroyed it in bad faith. Finally, the trial court found that the washcloth evidence had "inexplicably disappeared," and that the "[d]estruction of this evidence circumstantially lays at the foot of Detective Gray." Based on these findings, the trial court concluded that: "The actions of Detective Gray during this incident shows behavior evidencing a deliberate intent by an agent of Defendant to destroy or compromise the integrity of evidence. . . [and that there] is no doubt that Defendants, through Detective Gray, went to considerable efforts to destroy the rape kit which undermined Plaintiff's ability to establish that she was raped." Having found that B & M engaged in spoliation of evidence through the actions of its agent, Detective Gray, the trial court granted Banks's motion and sanctioned B & M by ruling that the jury be given an instruction conclusively establishing that Ms. Banks was raped.
Because B & M did not own or possess the destroyed evidence, the trial court was authorized to impose sanctions against B & M for spoliation only if there was sufficient proof that B & M had control over the destroyed evidence by virtue of its ability to control the nonparty entity or person who possessed and destroyed the evidence. See R.A. Siegel Co. v. Bowen, 246 Ga.App. 177, 179-183, 539 S.E.2d 873 (2000) (spoliation sanctions imposed against a party after agents for the party destroyed relevant evidence). To satisfy this requirement, the trial court concluded that B & M had control over the evidence at issue because Detective Gray destroyed the evidence acting as an agent for B & M. The majority finds that there was sufficient circumstantial evidence in the record to support this conclusion.
*660 First, the majority points out that, shortly after the Crisis Center sent the letter informing the Department that it had the rape kit, an attorney representing B & M in the civil suit made telephone calls to the Crisis Center seeking the rape kit. According to the majority, a reasonable inference can be drawn from these facts that Detective Gray must have "informed B & M or its lawyers that the Crisis Center had the rape kit." Although this is pure speculation, even if there was evidence it was true, it does not support a reasonable inference that Detective Gray destroyed the evidence on behalf of B & M.
Second, the majority points out that, after the Crisis Center sent the above letter to the Department, Detective Gray picked up the rape kit from the Crisis Center in August 2002, even though he had closed the investigation file. According to the majority, Detective Gray had no "police purpose" for retrieving the rape kit in the closed investigation, so the trial court could reasonably infer that "he did so on behalf of his other employer, B & M, for use in the pending civil suit." Again, the mere fact that, after receiving the letter, the Department sent Detective Gray to pick up the rape kit does not support a reasonable inference that he did so as B & M's agent or that he later destroyed the evidence as B & M's agent. Detective Gray was assigned by the Department to the investigation, and even though he had closed the investigation, subject to further contact from Ms. Banks, he did so only after repeated unsuccessful attempts to get Ms. Banks to cooperate with the investigation.
Third, the majority points out that, even though Detective Gray said he logged in the rape kit at the Department the day he picked it up, Department records showed only a November 2002 log-in date. According to the majority, the trial court could reasonably infer from these facts (1) that Detective Gray kept the rape kit in his personal custody for three months in violation of Department policy and (2) that because the investigation file was closed, Detective Gray held the rape kit "on behalf of B & M." I agree that this evidence supports a reasonable inference that Detective Gray held the rape kit after he picked it up until the Department records show that he logged it into evidence in November, but this is not evidence that could support an additional reasonable inference that he held it or subsequently destroyed it as B & M's agent.
Fourth, the majority points out that in September 2002 an attorney for B & M asked Detective Gray after his deposition if he would find out if the GBI would be willing to analyze the rape kit; that Detective Gray agreed to find out, and that he later informed B & M's attorney that the GBI refused. According to the majority, this shows that Detective Gray's "only logical purpose" was to "assist B & M." Certainly, this evidence supports a reasonable inference that Detective Gray intended to assist B & M's attorney's and B & M with this request, but it is not reasonable to infer from this evidence that Detective Gray destroyed evidence as B & M's agent.
Finally, the majority points out that, shortly after Detective Gray logged in the rape kit in November 2002, he authorized Lieutenant Bradley to destroy it as unneeded evidence in the closed investigation, even though he knew that Ms. Banks had filed the civil suit against B & M. This evidence creates a suspicion that Detective Gray may have acted in bad faith when he authorized destruction of the rape kit, but it does not support a reasonable inference that he acted as an agent for B & M.
At best, the evidence pointed out in the trial court's order and the majority opinion creates a mere suspicion or possibility that Detective Gray destroyed the rape kit evidence in bad faith and that he did so while acting as an agent for B & M. And certainly the trial court's additional conclusion that the evidence shows Detective Gray destroyed the washcloth for B & M because it "inexplicably disappeared" is rank speculation. Aside from the fact that Detective Gray had worked as an off-duty security guard for B & M, there is no evidence in the record of any direct contact between B & M and Detective Gray. In fact, the only evidence of indirect contact was the fact that B & M's attorneys spoke to Detective Gray about determining if the GBI would analyze the rape kit. The *661 majority ignores the fact that even the trial court recognized that the contact between B & M's attorneys and Detective Gray provided no support for Ms. Banks's claim that B & M's attorney's were involved in spoliation of the evidence. But with no evidence of any contact between B & M and Detective Gray related to the civil suit, the majority piles one speculative inference upon another to endorse the trial court's conclusion that B & M destroyed evidence by acting through Detective Gray. The fact that Detective Gray worked off-duty as a security guard for B & M may create suspicion that he destroyed evidence to help B & M in the civil suit, but even if he acted with that motive, it provides no reasonable proof that he acted as B & M's agent.
On the record before the trial court, it was not reasonable to infer that B & M destroyed evidence by using Detective Gray as its agent. "The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." OCGA § 10-6-1. As with any other fact, an agency relationship may be established by circumstantial evidence "through circumstances, apparent relations, and the conduct of the parties." Johnston v. Warendh, 252 Ga.App. 674, 679, 556 S.E.2d 867 (2001). But circumstantial evidence which gives rise to mere suspicion or possibility is the equivalent of no evidence at all and provides no basis for the trial court to reasonably conclude or infer that Detective Gray destroyed the evidence as an agent for B & M. Ken Thomas of Ga., Inc. v. Halim, 266 Ga.App. 570, 574-575, 597 S.E.2d 615 (2004). Contrary to Ms. Banks's contention, this case is not similar to cases where this Court has found that, because of established business relations between corporate entities alleged to have an agency relationship, "[t]he threshold for showing agency in this context is low, and even scant factual support may suffice." Nissan Motor Acceptance Corp. v. Stovall Nissan, Inc., 224 Ga.App. 295, 298, 480 S.E.2d 322 (1997). The fact that Detective Gray worked as an off-duty security guard for B & M was not the type of business context addressed in those cases. In any event, Ms. Banks does not allege that an agency relationship existed between Detective Gray and B & M in the context of the off-duty employment, but that Detective Gray secretly acted as an agent for B & M while using his identity as a police officer. No lower threshold for proof of agency applied in this case.
On related discovery impropriety issues, this Court has repeatedly held that those decisions are within the sound discretion of the trial court, and that an appellate court will not interfere absent a clear abuse of discretion. Ga. Emission Testing Co. v. Reheis, 268 Ga.App. 560, 564, 602 S.E.2d 153 (2004). Because there is no evidence in the record which could support the trial court's finding that Detective Gray destroyed evidence as B & M's agent, I conclude that the trial court clearly abused its discretion, and that the order imposing sanctions for spoliation of evidence should be reversed. Bruce v. Wallis, 274 Ga. 529, 531, 556 S.E.2d 124 (2001) (trial court abuses discretion where judgment has no evidence to support it).
Finally, one additional point needs to be made in response to the majority opinion affirming the trial court's decision to sanction B & M by instructing the jury that Ms. Banks was raped. As both the majority opinion and trial court's order note, when B & M filed a motion in the trial court to have the rape kit independently analyzed by the GBI, Ms. Banks opposed the motion contending that the analysis was unnecessary because the rape kit had already been analyzed by Grady Hospital. If, as Ms. Banks contended, the rape kit was independently analyzed by Grady Hospital before it was destroyed and further analysis was unnecessary, then the rape kit analysis (if evidence of it exists) preserved the evidentiary value of the destroyed rape kit. If that is the case, then the trial court's basis for the imposition of sanctionsthat destruction of the rape kit undermined Ms. Banks's ability to prove that she was rapedis rendered moot by her ability to use the results of the rape kit analysis to establish that she was raped.
NOTES
[1] Gray testified that after speaking with Banks and obtaining a description of the rapist, he identified two suspects and developed a photographic lineup for each. Gray further testified that he was unable to contact Banks to view the lineups, despite visiting her apartment and leaving messages with her fiancé and his brother. Banks, however, testified that after her initial contact with Gray, he never called back and she never received any messages from him.
[2] Although the dissent states that "the Department sent Detective Gray to pick up the rape kit," Gray's deposition testimony suggests that henot anyone else at the Departmentmade the decision to retrieve the kit.
[3] See Bridgestone/Firestone North American Tire v. Campbell, 258 Ga.App. 767, 768, 574 S.E.2d 923 (2002); R.A. Siegel Co. v. Bowen, 246 Ga. App. 177, 179(2), 539 S.E.2d 873 (2000).
[4] Bridgestone/Firestone North American Tire, supra (footnote omitted).
[5] See R.A. Siegel Co., supra.
[6] See id. at 182, 539 S.E.2d 873.
[7] Addington v. Anneewakee, Inc., 204 Ga.App. 521, 420 S.E.2d 60 (1992).
[8] See, e.g., R.A. Siegel Co., supra (affirming trial court's factual findings in spoliation case).
[9] Id. at 179, 539 S.E.2d 873.
[10] OCGA § 10-6-1.
[11] Southern Exposition Mgmt. Co. v. Genmar Indus., 250 Ga.App. 702, 704-705, 551 S.E.2d 830 (2001); Nissan Motor Acceptance Corp. v. Stovall Nissan, 224 Ga.App. 295, 298(1), 480 S.E.2d 322 (1997).
[12] See R.A. Siegel, supra at 180, 539 S.E.2d 873 (whether nonspoliating party was prejudiced and whether prejudice can be cured are among factors that trial court should consider in fashioning remedy for spoliation).
[13] B & M contends that Banks could not have been prejudiced because she opposed its motion to have the GBI analyze the kit. Banks's opposition was based not on a desire to avoid analysis, however, but on her objection to Gray playing any role in obtaining the analysis and on the fact that Grady Hospital had already analyzed the kit. Therefore, her opposition to GBI analysis of the kit does not show a lack of prejudice.
[14] R.A. Siegel, supra (citation and footnote omitted).
[15] See id. at 182, 539 S.E.2d 873.
[16] The trial court's order mistakenly referred to a motion pursuant to OCGA § 9-11-15, but B & M and Banks agree that the motion was brought under OCGA § 9-15-14.
[17] Meister v. Brock, 268 Ga.App. 849(1), 602 S.E.2d 867 (2004) (punctuation omitted).