**FOURTH DIVISION**
**DILLARD, C. J.,**
**RAY, P. J. and SELF, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 19, 2017**

# In the Court of Appeals of Georgia

A17A1237. DEMERE MARSH ASSOCIATES, LLC et al. v. SE-048
  BOATRIGHT ROOFING AND GENERAL
  CONTRACTING, INC. et al.

A17A1238. DENNY EXPRESS VINYL SIDING, INC. v. SE-049
  BOATRIGHT ROOFING AND GENERAL
  CONTRACTING, INC. et al.

SELF, Judge.

These appeals arise from a suit alleging negligent construction, misrepresentation, and breach of contract involving the Shadow Brooke Village Condominiums in St. Simons Island, Georgia (the "Project") filed against the developer, general contractor, a roofing subcontractor, and a vinyl-siding contractor by the Shadow Brooke Village Condominium Owners' Association (the "Association"). The issues on appeal involve whether the Association's claims are barred by the statute of limitation, sanctions for spoliation, and the effect of a "full

and final judgment" entered in favor of the roofing subcontractor. For the reasons explained below, we conclude that (1) the Association's claims are barred by the statute of limitation, except with regard to building 15; (2) the trial court's order on spoliation should be reversed to the extent it allows the jury to make findings of fact as to whether spoliation occurred; and (3) this Court cannot issue an advisory opinion regarding the trial court's grant of summary judgment to the roofing subcontractor.

> To prevail at summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the nonmovant's favor, warrant judgment as a matter of law. A defendant who will not bear the burden of proof at trial need only show an absence of evidence to support an essential element of the nonmoving party's case. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue.

(Citation, punctuation, and footnote omitted.) *Danjor, Inc. v. Corporate Constr.*, 272 Ga. App. 695, 695-696 (613 SE2d 218) (2005). "A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most

favorable to the nonmovant."[1] (Citation and punctuation omitted.) *Costrini v. Hansen Architects*, 247 Ga. App. 136 (543 SE2d 760) (2000).

The record shows that the Project consists of 15 residential buildings, each comprised of six separate condominium units, for a total of 90 units, and a clubhouse. Construction of the buildings began in 2001, and was completed between 2003 and 2009, with buildings one through fourteen receiving certificates of occupancy between January 2003 and September 2008. Demere Marsh Associates, LLC (the "developer") was the developer, Sea Oaks, Inc. (the "general contractor") was the general contractor, Denny Express Vinyl Siding, Inc. (the "vinyl-siding subcontractor," collectively "appellants") was a subcontractor of the developer hired

---

[1] We note that in its brief, the Association cites only to record page numbers, many of which are inaccurate. The record in this case consists of 43 volumes and over 10,000 pages, and we reiterate that it is not the duty of this Court to cull the record on a party's behalf to locate information or facts in support of a party. See *Carlisle v. Abend*, 288 Ga. App. 150, 151 (1) (653 SE2d 388) (2007). "[I]t is the party's duty in the first instance to cite to such parts of the record or transcript essential to a consideration of [its arguments]." (Punctuation omitted.) *Pribeagu v. Gwinnett County*, 336 Ga. App. 753, 756, n. 3 (785 SE2d 567) (2016). And, such citations "shall be to the *volume* or part of the record or transcript and the page numbers that appear on the appellate record or transcript as sent from the trial court." (Emphasis supplied.) Ga. Ct. of App. R. 25 (a) (1). "Accordingly, if we have omitted any facts or failed to locate some evidence in the record, the responsibility rests with counsel." *AgriCommodities v. J. D. Heiskell & Co.*, 297 Ga. App. 210, 213-214 (1) (676 SE2d 847) (2009).

to install vinyl siding on buildings 2, 8, 9, 14, and 15, and Boatright Roofing and General Contracting, Inc. (the "roofing subcontractor") was the subcontractor that installed the roofs on some of the buildings for the Project.

On October 18, 2012, the Association sued the developer, general contractor, and both subcontractors, among others, alleging that negligent construction caused substantial damage to the buildings, particularly water damage. The crux of the complaint is that "[d]uring construction of the condominium complex, [the developer and general contractor] modified the design of the buildings and used materials that were not specified by the architect . . . and as a result, there was water intrusion and decay which has left the buildings unstable and at risk of collapse." The developer and general contractor filed a cross-claim against the roofing subcontractor for indemnity and/or contribution and a notice of apportionment.

The roofing subcontractor moved for summary judgment on the ground that all of the Association's claims against it were barred by the statute of limitation. The appellants moved for partial summary judgment on the ground that the applicable four-year statute of limitation and eight-year statute of repose barred the

Association's claims with regard to 14 of the 15 buildings.[2] Appellants also moved for sanctions for spoliation of evidence, on the ground that the Association "engaged in extensive destructive testing including the removal and discarding of material elements of evidence from the exterior facades" of the buildings after it filed suit against the appellants.

The Association consented to the entry of summary judgment in favor of the roofing subcontractor, and the trial court granted the motion, entering final judgment in favor of the roofing subcontractor and against the Association. The trial court granted in part and denied in part the remaining motions for summary judgment. As to buildings 3, 4, 5, 6, and 7, all of which were completed between July 2003 and August 11, 2004, the trial court determined that the statute of repose barred all of the Association's claims including for attorney fees under OCGA § 13-6-11. As to the developer's and general contractor's liability in connection with the remaining nine buildings, the trial court found that there was a genuine issue of material fact as to whether the Association knew or should have known of the construction problems by October 2008, and that "OCGA § 9-3-30 (b) (1) applies to protect the Association's

---

[2] Building 15 was completed on September 8, 2009, within four years of the Association's lawsuit.

5

claims from the four-year statute of limitation." As to the vinyl-siding subcontractor, the trial court concluded that the Association's claims regarding buildings 2, 9, and units 100, 101, and 300 of building 8 were barred by the statute of repose; it found genuine issues of material fact regarding buildings 14 and 15, as well as units 200, 201, and 301 of building 8 on the same ground set forth against the developer and general contractor. With regard to the spoliation motions, the trial court's order stated that they were granted in part and denied in part, but it "decline[d] to impose the sanction of dismissal of plaintiff's case."

In Case No. A17A1237, the developer and general contractor appeal the order granting summary judgment to the roofing subcontractor, as well as the orders partially denying their motion for summary judgment, the vinyl-siding subcontractor's motion for summary judgment, and the motions for sanctions for spoliation of evidence. In Case No. A17A1238, the vinyl-siding subcontractor appeals the same orders.

1. Appellants contend that the trial court erred in denying summary judgment on the Association's claims related to defective/improperly installed vinyl siding on buildings 1, 2, and 8-14, because there is no dispute that the Association knew or should have known of alleged construction defects on or before September 8, 2008.

6

Appellants argue that the synthetic siding exception set forth in OCGA § 9-3-30 (b) (1) does not revive the Association's "otherwise time-barred claims" as to these buildings and that the trial court erred in its reading of *Scully v. First Magnolia Homes*, 279 Ga. 336 (614 SE2d 43) (2005). The Association responds that the discovery of defects in the Project did not occur until approximately June or July of 2012, when a unit owner noticed water damage and mushroom growth on the tabby finish covering a wooden support beam on building 2.

The statute of limitation applicable to the Association's claim for negligent construction is found in OCGA § 9-3-30 (a), and provides that "[a]ll actions for trespass upon or damage to realty shall be brought within four years after the right of action accrues." OCGA § 9-3-30 (a). See *Danjor*, supra, 272 Ga. App. at 698 (2). The general rule for determining when a cause of action accrues and the statute of limitation begins to run is well-settled in Georgia: The true test to determine when a cause of action accrues is to ascertain the time when the plaintiff could first have maintained his or her action to a successful result. (Punctuation and footnote omitted.) *Scully*, supra, 279 Ga. at 337 (1). "Damage to property arising out of construction is generally considered to occur at the time of the defendant-contractor's 'substantial completion' of the project, because damages usually become immediately

7

ascertainable to the plaintiff-owner at that time." *Colormatch Exteriors, Inc. v. Hickey*, 275 Ga. 249, 251 (1) (569 SE2d 495) (2002). However, OCGA § 9-3-30 (b) (1) provides for an exception in the case of synthetic exterior siding: "The causes of action . . . for recovery of damages to a dwelling due to the manufacture of or the negligent design or installation of synthetic exterior siding shall accrue when the damage to the dwelling is discovered or, in the exercise of reasonable diligence, should have been discovered, whichever first occurs."

In *Scully*, the homeowners purchased a home constructed with synthetic stucco siding. When they discovered that the siding was defective and had damaged the underlying structure, they sued the builder for breach of contract and negligence. The trial court granted summary judgment to the builder finding that both claims were barred by the applicable statutes of limitation. This Court affirmed, and on the issue of negligence, the Georgia Supreme Court affirmed our decision, finding that we correctly held that the "statute of limitations for [the homeowners'] tort claim commenced running when [the homeowners], through the exercise of reasonable diligence, should have discovered that their home was being damaged due to defective synthetic stucco siding." Id. at 336-337. In so holding, our Supreme Court noted that in November 1997, the homeowners "became aware through media

8

accounts that faulty stucco siding installed on homes such as theirs was causing moisture damage to houses." Id. at 337. After hearing these accounts, the homeowners asked a neighborhood real estate agent if they should be concerned and were told the concerns were exaggerated. Two years later, in November 1999, the homeowners, prompted by further media accounts, hired an expert who confirmed the defective siding. The homeowners sued on October 8, 2002.

> In affirming our decision, the Georgia Supreme Court found that

> [b]y their own admission, the [homeowners] were aware of *potential problems* with their stucco siding no later than November 1997. Once they learned of this *potential problem*, they were obligated to exercise reasonable diligence to protect their interest in their home and their legal rights. At the same time, the four-year statute of limitations on their negligence claim began to run. The statute expired in November 2001, and the [homeowners'] suit alleging negligence was filed almost a year later, on October 8, 2002.

(Emphasis supplied.) Id. at 339 (2).

Here, the trial court applied OCGA § 9-3-30 (b) (1) to the synthetic exterior siding at issue in this case, refusing to "read OCGA § 9-3-30 (b) (1) so narrowly as to restrict its application to stucco siding only." The trial court also found *Scully* distinguishable on the ground that the homeowners in that case conceded that they

9

were aware of potential problems with their stucco siding over four years before they filed suit, whereas in this case, there is no evidence that the Association made any such concession. The trial court ruled that

> the determination of when the Association knew or should have known that the buildings were significantly damaged to the extent that it might have a cause of action against [appellants] cannot be made in a summary manner. Rather, a factual dispute exists as to whether it knew or should have known of the problems by October 2008, when there had been multiple roof leaks, as well as signs of water damage and mold, or as late as June or July of 2012, when it received the report from its retained expert, or at some point between those two dates.

Even assuming the trial court is correct in its application of the exception to this case,[3] the trial court erred in concluding that the evidence creates a material issue of fact as to "whether the Association knew, or with reasonable diligence, should have known, of the defects for which it seeks damages before October 18, 2008." Contrary to the trial court's interpretation, *Scully* does *not* require an admission or concession by the damaged party. Rather, *Scully* reiterates that the statute of limitation for the negligent installation of synthetic stucco siding commences running

---

[3] If the exception does not apply, then the Association's claims expired on September 30, 2012, four years after building 14 was completed and given a certificate of completion/occupancy.

when the claimant, "through the exercise of reasonable diligence, should have discovered that their home was being damaged due to defective synthetic . . . siding." Id. at 336-337. In that case, it was the discovery of a *potential problem* that should have prompted the homeowners to exercise reasonable diligence.

We need not undertake a lengthy recitation of the facts in this case to find that a potential problem with improperly installed or defective vinyl siding was discovered well before October 18, 2008, and that the Association was then obligated to exercise reasonable diligence to protect its interests. In its second amended complaint in this case, the Association alleges the following relevant acts of negligence against the developer and general contractor:

> Failure to install the moisture barrier, vinyl siding, and flashings to prevent water from entering the wall assemblies, causing damage to the structural elements and other components of the building; . . . Failure to apply the tabby stucco finish in compliance with the building code; . . . Failure to coordinate and fit the adjacent varying materials to each other which have resulted in gaps and open penetrations that have allowed moisture infiltration into the structures. . . .

Further, "[a]s a result of [said] negligence, the structural components of the building[s] were damaged and are no longer able to function as designed or intended. The gaps and penetrations in the building envelope have exposed internal

11

components of the building[s] to the weather and allowed water to collect inside the building envelope." With regard to the vinyl-siding subcontractor, the Association alleges in its second amended complaint that "[it] breached the applicable standard of care in the construction and installation of the vinyl siding on the buildings at the Project. . . ." As a result, "the structural components of the building[s] were damaged and are no longer able to function as designed or intended. The defects in the installation of the vinyl siding allowed water to enter the building envelope and caused damage to the structural components of the building[s]."

Our review of the record shows that Shadow Brooke Village homeowners began complaining of water intrusion issues as early as 2004. For example, in December 2004, a work order was completed on behalf of a homeowner asking to "investigate [a] musty smell around window dining room[,]" and in March 2007, two invoices for work "sold to" the Association document "repair roof leak[s] on top building[;] repair leak damage in living room[;] repair sheetrock damage in guest bathroom. . . ." The maintenance call logs from 2007 and 2008 also reflect numerous complaints about leaking roofs throughout the units, the breezeways, and the clubhouse, as well as mushrooms growing out of porch posts and porch beams "oozing dirty water."

In addition to the aforementioned evidence,[4] the record includes a report dated February 12, 2007, and prepared by A. L. Trogdon Company at the request of "the Shadow Brooke Homeowners AD HOC Committee." That report contained photographs and detailed the following issues involving the complex's roofs and vinyl siding and trim:

> There were several locations on the metal roof where the metal ridge cap is damaged and poorly installed. There are many areas where caulking compound was used to seal around metal ridge cap areas that were improperly installed. . . Caulking is unacceptable as a repair to metal ridge cap areas and flashing should be re-installed properly and sealed by a qualified roofer.
>
> There are a very few small areas on the roof where the rubberized membrane is beginning to blister because of air being trapped under the roofing membrane. These areas need to be repaired immediately by a qualified roofer.
>
> . . .
>
> There are areas where the vinyl siding and soffit is not installed securely. There are several areas where the vinyl trim does not fit

---

[4] The trial court noted in its order that the Association argues that these complaints could be construed by the trier of fact as "punch list issues" that were submitted to the general contractor for repair.

properly (gaps have been left) and many locations have been damaged. There is an area where the color of the trim is different. There is blistering of the aluminum cladding on the columns at the screen porches on several buildings. These areas should be repaired and/or replaced in a quality workmanship fashion.

On October 22, 2008, Ron Clark[5] wrote a letter to Robert Jenkins (principal of both the developer and general contractor) stating as follows:

As you are aware, portions of the supporting ceiling beams (2) on the ground floor of Building #150; next to the elevator area, are water soaked and dark in color. This could only indicate one thing – water is being retained within the sealed beams, thus water will leak out on the ground below. One of your employees knocked out the covering at the end of the beam. I could see that the beam was completely disintegrated and rotting away. The water contained within was running out in streams. After resealing the end of the support beam, rain water still drips out on the concrete walkway. Someone just diverted the water from one point to another. To me this is a disaster waiting to happen. Again it looks like your contractor failed to follow local and state building codes by using improper procedures. . . . Hopefully you are planning to resolve these major constructional defects.

---

[5] Clark purchased a condominium in Shadow Brooke Village in 2008, became a member of the Association's Board in 2009, and its president in 2010.

14

According to Clark, in January 2009, Jenkins represented that all issues raised by Clark in his letter were minor and had been completely repaired. Clark testified in his deposition that he discovered water coming out of the cantilever beam in "say September, October." Clark further testified that he "knew there was a problem [but] had no idea what water intrusion was at that time." When asked if he thought it was a potential issue at that point, Clark replied, "Yes, I thought it was a defect in building" but that the porch was rebuilt so he "concluded that the damages had been repaired to my knowledge, and I had no idea of what we were getting into it."

In his affidavit, Clark states that neither he nor the Association were made aware of "any potential water intrusion issues or other construction defects" between 2008 and July of 2012. Clark avers that "[p]rior to July 2012, I was not personally aware of any construction defects or water intrusion issues at the Project, including, but not limited to defects associated with the design or installation of synthetic exterior siding that is present on all 15 buildings." According to Clark, in 2012, a unit owner noticed water damage on "the tabby finish covering one of the wooden support beams" on building 2, including mushrooms growing out of the structure. Shortly after that discovery, the Association "retained an architect[, R. Allen Lougheed,] to determine the extent of the damage and to determine whether the condition was

15

isolated to one building or if it had occurred at other buildings." Clark also avers that the Association was established in 2002; that the developer turned over control of the Association to the homeowners on April 28, 2007; that Jenkins remained on the Board as president until March 8, 2008; and that Jenkins' wife was a member of the Board until March 2010.

In a second affidavit filed by the Association, Flo Vining, a Shadow Brooke homeowner and member of the Association's Board, averred that between 2003 and 2012, "no building ever showed visible signs of water intrusion until stucco was removed from Building 109 in 2012." Vining further stated that, "[f]rom the time the 'punch list' items were addressed by . . . Jenkins until the mushroom was discovered on Building 109 in 2012, I did not observe nor was I made aware of any water intrusion issues either as a Board member or an individual unit owner." To Vining's knowledge "no unit owner has ever raised concerns of any water intrusion or construction defects at any Annual Homeowners Meeting until the mushroom was discovered on Building 109 in 2012."

The Association argues that the "incidences" complained of by unit owners were isolated punch-list issues submitted to the general contractor for repair and not indicative of the serious structural issues outlined in its complaint. However, *Scully*

16

does not obligate homeowners to exercise reasonable diligence to protect the interest in their home upon learning of *serious structural issues*; *Scully* merely requires that a homeowner exercise reasonable diligence to protect their interest *upon learning of potential problems*, which is precisely the situation in this case. As early as 2004, unit owners began complaining of numerous water-intrusion issues, and the February 12, 2007 report prepared by the A. L. Trogdon Company at the behest of the Association documented existing and potential damage to the buildings because of improperly installed flashings and vinyl siding, the exact issues alleged in the second amended complaint. Once the Association learned of these existing and potential problems, it was "obligated to exercise reasonable diligence to protect [its] interest[s] . . . and [its] legal rights."[6] Giving the Association the benefit of the doubt, the four-year statute

---

[6] To the extent the Association argues that the Clark and Vining affidavits create an issue of fact as to when the Association should have discovered a potential problem, we find no merit in this contention. Both affiants aver that they "reviewed documents and information to state the facts contained herein." The unspecified documents and information reviewed by Clark and Vining are not attached to their affidavits in violation of OCGA § 9-11-56 (e) ("[s]worn or certified copies of all papers or parts thereof referred to in an affidavit [supporting or opposing summary judgment] shall be attached thereto or served therewith"). While the documents and information reviewed by Clark and Vining may be part of the record, the specific documents and information relied upon were not listed or otherwise identified in either affidavit. Accordingly, the affidavits lack probative value in response to appellants' motions for summary judgment and should not have been relied upon by the trial court. See *Nettles v. Laws*, 172 Ga. App. 241 (322 SE2d 546) (1984) (where

17

of limitation on their negligence claim began to run on February 12, 2007. The statute expired on February 12, 2011, and the Association did not file suit until October 18, 2012. Accordingly, it follows that the trial court erred in denying summary judgment to appellants on the Association's claims as to buildings 1, 2, and 8-14 based on the negligent design or installation of the exterior vinyl siding.

2. Appellants contend that the trial court erred in failing to grant summary judgment on the Association's claims for attorney fees pursuant to OCGA § 13-6-11. In its order, the trial court ruled that "[w]here the [c]ourt finds that the record contains evidence from which a jury could find that [the general contractor and developer] . . . acted in bad faith, their motions for summary judgment as to the Association's claim for attorney's fees under OCGA § 13-6-11 – at least as it relates to buildings 1, 2, 8, 9, 10, 11, 12, 13, and 14 – is hereby denied." Our holding in Division 1, supra,

"affidavit offered by appellant was based solely on information not part of the record in this case, the trial court correctly found that the affidavit had no probative value in response to the motion for summary judgment"). Additionally, we find no merit in the Association's contention that Jenkins' own testimony creates a material issue of fact because he testified that "he was not aware of any existing defects or signs of water intrusion or water damage until 2011 or 2012, and that prior to June of 2012 he did not have any knowledge of the existence of any moisture related problems." As our finding in this Division makes clear, the Association's own records and the report prepared by the A. L. Trogdon Company should have put the Association on notice of a potential problem.

reversing the trial court's denial of summary judgment to appellants on the Association's claims as to buildings 1, 2, and 8-14 requires that we likewise reverse the trial court's denial of summary judgment to appellants on the Association's claims for attorney fees pursuant to OCGA § 13-6-11, as such claims relate to buildings 1, 2, and 8-14. See *Coca-Cola Bottlers' Sales and Services Co. LLC v. Novelis Corp.*, 311 Ga. App. 161, 166 (3) (715 SE2d 692) (2011).

3. Appellants contend that the trial court erred in entering a "full and final judgment" in favor of the roofing subcontractor, potentially impacting their cross-claims for contribution and indemnity against the roofing subcontractor as well as their rights of apportionment. Appellants contend that "[w]hether and how a full and final adjudication impacts [their] claims of contribution and indemnity, and right of apportionment, is entirely unclear." Appellants point out that the roofing subcontractor is not a settling party under the apportionment statute, OCGA § 51-12-33 (d) (1), and that the exact scenario here has not been addressed in Georgia. Appellants "seek clarification at this time." In reply, the roofing subcontractor argues that (1) "[a]ppellants have no right of contribution against [it] under [OCGA § 51-12-33 (b)] because they . . . cannot be joint tortfeasors having a right of contribution from each other[,]" and (2)

19

[u]nder [OCGA § 51-12-33] [a]ppellants would have no liability to [the Association] in the absence of a finding by the jury that one (or both) of them was itself negligent in a specific percentage amount. Any negligence on the part of [the roofing subcontractor] would be apportioned by the jury to [the roofing subcontractor] in a separate percentage amount and not to [a]ppellants, or either of them.[7]

The record reflects that the roofing subcontractor installed the roofs on some of the buildings for the Project. The company last installed roofing on the Project in 2008 or 2009, and was officially dissolved on December 30, 2010. In its second amended complaint, filed on April 10, 2015, the Association asserted claims against the roofing subcontractor for negligence and violation of the building code. The roofing subcontractor was not served with the second amended complaint until May of 2016. On July 26, 2016, the developer and general contractor filed a notice of intent to apportion damages, naming a number of defendants and non-parties, including the roofing subcontractor. On August 12, 2016, the roofing subcontractor filed its motion for summary judgment on statute of limitation grounds. Neither the

---

[7] See *Barnett v. Farmer*, 308 Ga. App. 358, 360-361 (2) (707 SE2d 570) (2011) (physical precedent only) for a discussion of apportioning an award of damages.

20

Association nor appellants opposed the motion and on October 24, 2016, the trial court granted it, finding as follows:

> [The] Motion for Summary Judgment having been read and considered, and it appearing to the Court that Plaintiff does not oppose said Motion, IT IS HEREBY ORDERED AND ADJUDGED that consistent with the findings of this Court's Order entered June 22, 2016,[8] said Motion is granted and that Summary Judgment is hereby entered in favor of [the roofing subcontractor] upon [the Association's] claims. Pursuant to OCGA § 9-11-54 (b) the Court hereby determines that there is no just reason for delay and therefore expressly directs the entry of final judgment in favor of [the roofing subcontractor] upon [the Association's] claims.

According to appellants, this exact issue was not specifically briefed, but rather was raised at an oral argument concerning whether a consent judgment agreed to by the roofing subcontractor and the Association, but objected to by appellants, should be a "full and final judgment." While the trial court apparently disagreed with appellants on the terminology question as indicated by the wording of its order, there is no evidence that the trial court, either expressly or impliedly, issued a ruling as to whether or how the entry of final judgment would impact appellants' apportionment

---

[8] The June 22, 2016 order is the subject of Division 1, supra.

21

claim. "Absent a specific ruling by the trial court as to the exact [issue], there is nothing for us to review." *State v. Adams*, 209 Ga. App. 141 (433 SE2d 355) (1993). "This court does not render advisory opinions." Id. See also *Sosebee v. McCrimmon*, 228 Ga. App. 705, 709 (2) (492 SE2d 584) (1997).

Moreover, since the case has not been tried, the trier of fact has not even been given an opportunity to consider, let alone err in deciding, the issue of apportionment of damages."We normally limit our rulings to the specific case or controversy decided by the trial court, and do not venture an opinion as to the legality of future actions which may or may not occur." *Sentry Ins. v. Majeed,* 194 Ga. App. 276, 277 (2) (390 SE2d 269) (1990). See also *Dempsey v. Gwinnett Hosp. System*, 330 Ga. App. 469, 475 (3) (765 SE2d 525) (2014) ("Georgia appellate courts are not authorized to render advisory opinions as to potential error").

4. In their final enumeration, appellants contend that the trial court erred in refusing to make factual findings concerning spoliation, and issuing a remedy thereafter, despite agreeing that the Association spoliated material evidence. In their motions for sanctions for spoliation of evidence, appellants allege that after commencing litigation, the Association began removing tabby and vinyl siding from the buildings and engaging in destructive testing without notifying appellants.

Appellants sought dismissal of the complaint. Alan Lougheed, the expert hired by the Association, testified that either he or the Association opened up and/or removed vinyl siding, pulled down soffit material, opened up Z-flashing, cut out tabby samples from various buildings, and removed tabby from the ends and bottom of "virtually every one of the 300 support beams." The trial court granted the motions, ruling as follows:

> IT IS HEREBY ORDERED that the motions are GRANTED in part and DENIED in part. The [c]ourt declines to impose the sanction of dismissal of [the Association's] case. At this time, the [c]ourt is inclined to charge the jury on the law of spoliation and to allow the jury to make appropriate findings of fact on the issue of spoliation at trial.

"Spoliation refers to the destruction or failure to preserve evidence that is necessary to contemplated or pending litigation." (Footnote omitted.) *Bouve & Mohr, LLC v. Banks*, 274 Ga. App. 758, 762 (1) (618 SE2d 650) (2005). "The trial court is the trier of fact [in discovery disputes] and its finding . . . will not be reversed where there is any evidence to support it." (Citation and punctuation omitted.) *Addington v. Anneewakee, Inc.*, 204 Ga. App. 521, 522 (420 SE2d 60) (1992). This standard applies to the consideration of a motion for spoliation sanctions: "In determining whether to impose sanctions for evidence spoliation, trial courts routinely and

23

necessarily make factual findings about whether spoliation occurred" and fashions appropriate remedies. *Bouve & Mohr*, supra, 274 Ga. App. at 762 (1).

In this case, appellants have not challenged the trial court's refusal to impose sanctions; rather, appellants contend that the trial court erred in "assigning the legal and evidentiary gatekeeping function to the jury." It appears the trial court attempted to reserve its ruling upon the ultimate sanction it would impose for spoliation and inartfully stated that it might charge on the rebuttable presumption arising from spoliation and allow the jury to decide during deliberations whether to apply the presumption.[9] To the extent the trial court's order can be interpreted as allowing the jury to make findings of fact as to whether spoliation occurred, it must be reversed. We reiterate that it is the duty of the trial court – and not the jury – "to make factual findings about whether spoliation occurred, whether the spoliator acted in bad faith, the importance of the compromised evidence, and so on. The trial court . . .

---

[9] The spoliation of evidence "may give rise to the rebuttable presumption that the evidence would have been harmful to the spoliator." *Phillips v. Harmon*, 297 Ga. 386, 393-394 (II) (774 SE2d 596) (2015). However, "a rebuttable presumption or adverse inference jury instruction . . . is to be given as a remedy for spoliation of evidence only in exceptional cases [and] the greatest caution must be exercised in its application. . . ." Id. at 398.

24

determines what evidence the jury may hear and which issues it must resolve." (Citation, punctuation, and footnote omitted.) *Lustre-Diaz v. Etheridge*, 309 Ga. App. 104, 106 (709 SE2d 309) (2011). If the trial court finds evidence of spoliation, it is "authorized to craft a solution that fits the facts [including (1) charging] the jury that spoliation of evidence creates the rebuttable presumption that the evidence would have been harmful to the spoliator; (2) dismiss[ing] the case; or (3) exclud[ing] testimony about the evidence." (Citation and punctuation omitted.) *Kitchens v. Brusman*, 303 Ga. App. 703, 709 (1) (694 SE2d 667) (2010).

For the reasons discussed above, in Case No. A17A1237, we reverse, in part, the trial court's denial of appellants' motions for summary judgment and hold that appellants are entitled to summary judgment on buildings 1 through 14. In Case No. A17A1238, we affirm that portion of the trial court's order denying the vinyl-siding subcontractor's motion for summary judgment with regard to building 15 as it was completed within four years of the Association's suit, but reverse the trial court's denial of summary judgment as to buildings 8 and 14. In both cases, we reverse the trial court's spoliation order to the extent it allows the jury to make findings of fact as to whether spoliation occurred. Finally, we decline appellants' invitation to issue an advisory opinion on whether the entry of a "full and final judgment" in favor of

the roofing subcontractor impacts appellants' claims of contribution and indemnity, and their right of apportionment.

*Judgment affirmed in part and reversed in part. Dillard, C. J., and Ray, P. J., concur.*