A01A2072, A01A2075. WOLF CAMERA, INC. v. ROYTER;
and vice versa.
A01A2073, A01A2076. WAYNE v. ROYTER; and vice versa.
A01A2074, A01A2077. SMITH v. ROYTER; and vice versa.
(558 SE2d 797)

BLACKBURN, Chief Judge.

In this action regarding the malicious prosecution of a store employee for theft, Wolf Camera, Inc., Leonard Wayne, and Rex Smith (defendants) appeal the jury's verdict of $580,000[1] in favor of Arthur Royter, contending that the trial court erred by: (1) denying their motions for a directed verdict and judgment notwithstanding

---

[1] The jury awarded $380,000 in compensatory damages and $200,000 in punitive damages.

the verdict; (2) charging the jury on punitive damages; and (3) allowing testimony regarding an incident involving Royter and Wayne's wife. In related cross-appeals, Royter contends that the trial court erred by denying his request for prejudgment interest pursuant to OCGA § 51-12-14. For the reasons set forth below, we affirm.

### Case Nos. A01A2072, A01A2073, and A01A2074

1. Defendants contend that the trial court erred by denying their motions for directed verdict and j.n.o.v. on the malicious prosecution charges.

> In determining whether the trial court erred by denying [defendants'] motion for a directed verdict and motion for judgment n.o.v., this court must view and resolve the evidence and any doubt or ambiguity in favor of the verdict. A directed verdict and judgment n.o.v. are not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, demands a certain verdict.

(Punctuation omitted.) *Dept. of Transp. v. Dalton Paving &c.*[2]
Viewed in this light, the record reveals that Royter was employed as a salesperson at a Wolf Camera store located on Jimmy Carter Boulevard. Smith was the store manager, and Wayne served as the store's district manager. Beginning in January 1994, the store began experiencing cash shortages, and Wayne decided to install a hidden camera above the cash register to monitor his sales staff. On May 13, 1994, Wayne, with Smith present, approached Royter with videotaped footage of May 9, 1994, and May 10, 1994. Wayne informed Royter that these videotapes contained footage of him taking money from the cash register at approximately 10:42 a.m. and putting it in his pocket.

Wayne then called the police to report the alleged theft. Officer Timothy Thompson responded to the call. When Officer Thompson arrived at the store, Wayne informed him that shortages had been occurring since January,[3] and he showed Officer Thompson part of the May 10 videotape in which Royter could be seen removing cash from the register. Wayne and Smith then asked Officer Thompson to take out a warrant on Royter. Based on the information that he was

---

[2] *Dept. of Transp. v. Dalton Paving &c.*, 227 Ga. App. 207, 213 (489 SE2d 329) (1997).
[3] Wayne informed Officer Thompson that during this period of time the store had lost $1,470.

given along with what he had seen on the May 10 videotape, Officer Thompson arrested Royter.

Royter denied Wayne's charges of theft to Officer Thompson. Royter also testified that he consistently denied the charges to Wayne and Smith as well; however, both Wayne and Smith testified that Royter confessed his guilt separately to each of them. Interestingly, neither Wayne nor Smith ever reported these confessions to the police.

Subsequent to Royter's arrest, Wayne discovered that Royter had logged in a "paid out" slip at 5:00 p.m. on the date that he was accused of stealing. This slip showed that Royter had used store money to purchase supplies. Wayne did not come forward with this information, and neither did Smith, although Smith, as Royter's direct supervisor, had personally signed the paid out slip. Wayne testified that, prior to Royter's arrest, he made no attempt to determine whether there had been a paid out slip which would support the legitimacy of Royter's removal of cash from the register. In addition, the state solicitor-general's file indicates that Wayne agreed to provide copies of data sheets tracking use of the register and Smith stated that he could "back up shortages and documentation." Wayne and Smith never did so. Ultimately, the paid out slip was not produced by defendants until the second day of Royter's criminal trial, after they had been ordered to do so by the trial judge.

Royter and Wayne were neighbors, and, when Royter applied for the position at Wolf Camera, he listed Wayne as one of his references. Smith testified that Royter, prior to his termination, discussed an incident involving Wayne's wife with three other employees.

In addition to not bringing forth information concerning the paid out slip, Wayne did not come forward with information that shortages occurred prior to Royter's termination on days when Royter was not working. He also failed to disclose that the shortages continued after Royter's arrest. Furthermore, at trial, Wayne admitted that he could not tell from the videotape whether Royter had engaged in theft or a legitimate transaction, despite his contrary statements to Officer Thompson at the time of Royter's arrest.

Wolf Camera and its representatives also seemed to have some trouble providing relevant evidence. In response to a subpoena, Wolf Camera ran two printouts from its computer regarding paid out transactions in the Jimmy Carter Boulevard store on May 10, 1994. The first printout involving cash paid out transactions showed that Royter registered a paid out on the day in question. The second printout regarded "in-store paid outs," or paid outs used to requisition products already in the store, and it showed that no such in-store paid outs occurred. Only the second printout was provided to the solicitor, despite the fact that the first printout showed that a

paid out had occurred on the date in question. And, despite corporate policy to the contrary, the detail tape for the register which Royter used was destroyed, and the closing checklist was discarded.

In addition to this information, Royter, during the malicious prosecution trial, pointed out numerous inaccuracies in Wayne's testimony at an earlier hearing to determine whether Royter was entitled to unemployment compensation benefits. These inaccuracies include representations that, among other things, no paid outs had been posted and no shortages had occurred since Royter's termination.

This evidence presented created a proper issue for the jury regarding Royter's malicious prosecution pursuant to OCGA § 51-7-40,[4] contrary to the defendants' contentions that: (a) they could not be considered prosecutors; (b) probable cause existed for the initial arrest; and (c) no showing of malice was made.

(a) Defendants contend that only the solicitor could be considered a prosecutor in this case because they made no efforts to try Royter. The record, however, contains evidence contrary to this assertion.

First, Officer Thompson testified that Wayne and Smith asked him to arrest Royter. Second, despite their discovery of exculpatory evidence, the defendants kept this evidence to themselves. And, third, although the defendants may not have constantly pushed the prosecution forward, they refused to drop the charges despite the exculpatory evidence held by them. In addition, contrary to Smith's arguments, the evidence could support a determination that the defendants acted in concert to further the prosecution against Royter. There was some evidence that all three defendants withheld information favorable to Royter, and, based on this fact, the jury could have determined that the defendants conspired to ensure Royter's conviction. *Branson v. Donaldson*.[5]

The defendants further maintain that that they cannot be considered prosecutors in this case because Officer Thompson conducted an independent investigation prior to the arrest of Royter.

> The law draws a fine line of demarcation between cases where a party directly or indirectly urges a law enforcement official to begin criminal proceedings and cases where a party merely relays facts to an official who then makes an independent decision to arrest or prosecute. In the former

---

[4] OCGA § 51-7-40 provides: "A criminal prosecution which is carried on maliciously and without any probable cause and which causes damage to the person prosecuted shall give him a cause of action."

[5] *Branson v. Donaldson*, 206 Ga. App. 723, 726 (3) (426 SE2d 218) (1992).

case there is potential liability for malicious prosecution; in the latter case there is not. It is clear, though, that initiation of the criminal action need not be expressly directed by the party to be held liable. A distinction must be taken between actually instigating or procuring the institution of criminal proceedings and merely laying information before a law enforcement official without in any way attempting to influence his judgment. A person may be liable where he gave information to the investigating officer which he knew to be false and so unduly influenced the authorities.

(Citations and punctuation omitted.) *Willis v. Brassell.*[6]

The defendants argue that Royter's arrest was the product of Officer Thompson's individual judgment, not any actions or statements by the defendants. The record belies this argument. When asked whether he conducted an independent investigation, Officer Thompson testified: "No, Sir. Other than what statements I had received from the complainant and what I actually saw on the video, I determined that there was probable cause, that I felt probable cause for arrest."

(b) The defendants contend that Royter's arrest was supported by probable cause and, as such, no action for malicious prosecution was viable.

OCGA § 51-7-43 provides: "Lack of probable cause shall exist when the circumstances are such as to satisfy a reasonable man that the accuser had no ground for proceeding but his desire to injure the accused. Lack of probable cause shall be a question for the jury, under the direction of the court."

As an initial matter, the defendants argue that, because Royter's motion for directed verdict was denied at his prior criminal trial, Royter could not show at the subsequent civil trial that no probable cause existed for his arrest.

"[O]ne of the essential elements of an action for malicious prosecution, the lack of probable cause (see OCGA § 51-7-40), cannot be established as a matter of law if in the preceding criminal action the court denied the claimant's motion for directed verdict of acquittal and that ruling stands unreversed and *untainted by fraud or corruption.*"

(Emphasis supplied.) *Wingster v. Huntley's Jiffy Stores.*[7]

Here, although the trial court in Royter's criminal trial denied

---

[6] *Willis v. Brassell,* 220 Ga. App. 348, 350-351 (1) (a) (469 SE2d 733) (1996).
[7] *Wingster v. Huntley's Jiffy Stores,* 200 Ga. App. 252 (407 SE2d 481) (1991).

his motion for directed verdict, there was evidence in the malicious prosecution trial which could support the jury's determination that such denial was obtained through fraud committed by the defendants. As discussed above, there was evidence which could support a determination by the jury that the defendants acted in unison to frame Royter and conceal exculpatory evidence. And, because the trial court's denial of Royter's motion for directed verdict was based on evidence which the jury found to be disingenuous, it cannot be said that it was procured in the absence of fraud or deceit.

> Thus, unless the facts regarding probable cause are undisputed, it is a question for the jury. The facts were decidedly in dispute, leaving to the jury the task of determining if the circumstances were such so as to create an honest and reasonable belief in [defendants'] mind[s] that there was probable cause for the prosecution. Probable cause can be found only after reasonable and proper inquiry. It cannot exist if [defendants] knew that the facts stated to the law enforcement official were false or if [they] failed to make a fair, full, and complete statement of the facts as they existed, or if [they] concealed facts. The [defendants'] belief then could not possibly be "honest" or "reasonable."

(Citations and punctuation omitted.) *Willis*, supra at 353 (4).

(c) Finally, defendants argue that Royter failed to show that they acted with malice.

OCGA § 51-7-44 provides: "A total lack of probable cause is a circumstance from which malice may be inferred; however, the inference may be rebutted by proof." In this case, the defendants argue that two main pieces of evidence supported a finding of probable cause to arrest Royter: his admissions to Wayne and Smith and the videotape. From the evidence placed before it, however, the jury in the malicious prosecution case could have determined that neither piece of evidence supported a finding of even partial probable cause.

With regard to Royter's alleged admissions, Royter denied that he ever admitted anything to Wayne and Smith, and it is clear that the jury believed him and concluded that Wayne and Smith lied. Based on this determination of credibility, the jury could conclude that the alleged confessions did not occur and, as such, provided no probable cause.

In conjunction with this finding, the jury also had some evidence from which it could determine that the videotape provided as evidence of Royter's theft was offered in furtherance of a conspiracy to have Royter arrested. At trial, Wayne admitted that, based on the videotape, it could not be determined whether Royter was taking

money or committing a valid transaction. Combined with the jury's finding that Wayne and Smith lied about Royter's confession, the jury could determine that the videotape, which was admittedly ambiguous, was merely one part of defendants' scheme, which, in and of itself, provided no probable cause.

2. Defendants contend that the trial court erred by charging the jury on the issue of punitive damages separate and apart from the malicious prosecution charge, contending that the charges were duplicative and resulted in double recovery.

The record shows that, although defendants objected to charging the jury on punitive damages, they, in fact, submitted written requests to charge the jury on that very issue. And, the court granted some of these requests in its charge on punitive damages. Defendants have, therefore, waived their right to take issue with the trial court's charge on appeal. As a general matter, a defendant cannot complain of a decision to which his conduct contributed. *Hawkins v. State.*[8]

3. Defendants contend, in the alternative, that, even if the trial court properly instructed the jury on punitive damages, the jury's award must nonetheless be overturned based on *Roberts v. Lane.*[9]

In *Roberts*, a husband and wife were found liable for defamation on a joint and several basis. On appeal, this court found that, although the evidence supported a finding against the husband, it did not support a finding against the wife, and we reversed the judgment against her. Because of this reversal, we went on to hold:

> "(t)he effect of" reversing the judgment against Mrs. Roberts "is to impose attorney fees and to assess punitive damages that the jury may have based, in whole or in part, upon the acts or intentions of" Mrs. Roberts. The jury might not have awarded the total amount of attorney fees or the sum of $10,000 for punitive damages if they were considering Mr. Roberts' liability alone. He is entitled to a new trial with regard only to these damages.

(Emphasis omitted.) Id. at 13 (3).

*Roberts* has no relevance here. In this case, we find that the evidence did support the finding of malicious prosecution against all three defendants. Therefore, the award of punitive damages remains binding against all three.

4. Finally, defendants contend that the trial court erred by allowing Royter to introduce testimony regarding an incident involving Wayne's wife. During trial, testimony revealed that, prior to his

---

[8] *Hawkins v. State*, 195 Ga. App. 739 (2) (395 SE2d 251) (1990).
[9] *Roberts v. Lane*, 210 Ga. App. 10 (435 SE2d 227) (1993).

termination, Royter talked to some of his fellow employees about certain incidents involving Wayne's wife when Wayne was not at home. After a number of questions had been posed to Royter regarding this subject, defendants finally made a motion to strike, arguing that the evidence was not relevant.[10]

In general, the admission of evidence is a matter within the sound discretion of the trial judge. Moreover, Georgia law favors the admission of any relevant evidence, no matter how slight its probative value may be, and, on the balance, evidence of even doubtful relevance should be admitted. *Baker v. State*.[11]

In this case, the evidence certainly had some relevance, as it provided a possible motive for Royter's dismissal. To the extent that this evidence was tenuous, defendants had the right to point that out to the jury. Defendants did not, however, have the right to keep this information from the jurors altogether.

## *Case Nos. A01A2075, A01A2076, and A01A2077*

In his cross-appeal, Royter contends that the trial court erred by denying his motion for prejudgment interest. We cannot agree.

The record shows that Royter, prior to trial, mailed separate demand letters to Wayne and Wolf Camera[12] requesting a payment of $300,000 within 30 days in order to invoke the notice provisions of OCGA § 51-12-14.

> The Unliquidated Damages Interest Act establishes specific procedures for the recovery of prejudgment interest. OCGA § 51-12-14. As the statute is in derogation of the common law, it must be strictly construed. Claimants who give the requisite statutory written notice and demand can recoup prejudgment interest "on the amount demanded if, upon trial of the case in which the claim is made, the judgment is for an amount not less than the amount demanded." OCGA § 51-12-14 (a).

(Citation omitted.) *Kuhl v. Shepard*.[13]
As an initial matter,

> [a]lthough the law in this state encourages the resolution in one action of all claims arising from a single occurrence or

---

[10] Defendants previously filed a motion in limine to exclude such evidence in its entirety because it was speculative in nature.

[11] *Baker v. State*, 246 Ga. 317, 319 (3) (271 SE2d 360) (1980).

[12] No letter was conveyed to Smith.

[13] *Kuhl v. Shepard*, 226 Ga. App. 439, 440 (487 SE2d 68) (1997).

transaction, each letter sent by [Royter] offered to settle [his] claims by covenant not to sue in favor of the letter's recipient, thus terminating the action as to that particular party. It is apparent from the demand letters that if any recipient had paid the sum demanded in the letter it received, that payment would not have ended the entire litigation, which would have continued against the other defendants until the total of the sums demanded from all was paid. Thus, the aggregate sum claimed by [Royter] from all the defendants — the "sum claimed" — in this case was [$600,000] rather than $300,000 as urged by [Royter].

(Citations and punctuation omitted.) *Bullman v. Tenneco Oil Co.*[14]

Further, although [Royter] correctly notes that the judgment against [defendants] was joint and several, thus entitling [him] to collect the entire amount from either party, should [Royter] in fact satisfy [his] judgment completely by collecting it from one [of the defendants], [he] would then be entitled to collect nothing from the other. Since the party paying the full judgment under those circumstances would then be entitled to pro rata contribution from the other judgment debtors, in the instant case each [defendant] ultimately is liable only for a pro rata share of the [$580,000].

(Citation and emphasis omitted.) *Bullman*, supra at 410. Accordingly, the trial court did not err in denying Royter's motion for prejudgment interest in this case.

*Judgments affirmed. Pope, P. J., and Mikell, J., concur.*

DECIDED JANUARY 14, 2002.

*Cobb, Grabbe, Spillers & Irwin, R. Chris Irwin*, for appellants. *David P. Smith*, for appellee.

---

[14] *Bullman v. Tenneco Oil Co.*, 197 Ga. App. 408, 409-410 (398 SE2d 311) (1990).