## A10A1868. WRIGHT v. VIF/VALENTINE FARMS BUILDING ONE, LLC et al.

(708 SE2d 41)

ADAMS, Judge.

In this dispute over a property line that involves the location of two different alleged "hog wire" fences, J. B. Wright brought suit alleging trespass against three groups of defendants associated with the neighboring property: the prior owners, the alleged trespassers who developed the property, and the subsequent purchaser/occupant. Wright appeals three orders entered by the trial court: summary judgment in favor of the prior owners; Spoliation Order No. 1, in which the court dismissed all claims against the current occupant of the property; and Spoliation Order No. 2, in which the court sanctioned Wright by requiring the jury be instructed on a rebuttable presumption arising from spoliation in his claim against the developers.

1. We begin with Wright's appeal of summary judgment in favor of the prior owners of Wright's neighboring property. Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant. *Home Builders Assn. of Savannah v. Chatham County*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003).

The basic facts can be summarized. For many years, Dr. Herbert E. Valentine, Jr., and the Wright family owned large contiguous tracts of rural land in Jackson County, with the Wrights located to the east of the Valentines. It is not disputed in this litigation that roughly 1,300 feet of the boundary has a meandering hog wire fence that runs somewhat north-to-south and somewhat straight from Wayne Poultry Road to a certain beech tree stump. In dispute is the position of the boundary running from the beech tree stump to an agreed southern endpoint. The appellees contend the boundary continues on a precisely straight line for 717.10 feet from the beech tree stump to the southern endpoint, and that, as late as the 1990s, a hog wire fence existed along this line. Wright alleges that errors in the Valentine chain of title and associated surveys fail to reflect that beginning at the beech tree stump, the property line runs along or parallel to a different hog wire fence built by his father in the 1950s that curved to the west, carving out a 0.86-acre, crescent-shaped area ending at the southern endpoint, and that this fence existed until the defendants destroyed it, which precipitated this litigation. The first 470 feet or so of the line is the border claimed by current occupant; the remainder is still claimed by Valentine-related interests. Thus the piece of property in dispute is somewhat triangular in shape.

It is undisputed that in 1992, Dr. Valentine sold all of his property to Possum Creek Properties, L.P. ("PCP"), a limited partnership controlled by Valentine family members, which eventually decided to create an industrial park on the property. In that regard, in July 2004 PCP agreed to sell a 60.85-acre tract to Grove Street Partners, LLC ("GSP"). The tract at issue did not recognize and extended past the hog wire fence asserted by Wright as the boundary. The sales agreement was later assigned to Valentine Farms Land, LLC ("VFL"). Thus, in April 2005, PCP conveyed the tract to VFL, which, in turn, conveyed its interest to VIF/Valentine Farms Building One, LLC ("VIF"). These three entities — VFL, VIF and GSP — will be collectively referred to as the "Warehouse Development Interests," and despite their names, none are related to or controlled by the Valentine family. Thus, as of April 2005, neither Dr. Valentine nor the Valentine family owned or controlled any interest in the relevant 60.85-acre tract, although PCP retained parts of Dr. Valentine's original property. Wright notes that Dr. Valentine signed a "Seller's Affidavit" in connection with the sale in which he swore that "the lines and corners of the Property are clearly marked and there are no disputes concerning the locations of the lines and corners."[1]

Construing the disputed facts in favor of Wright, the record shows that beginning on November 2, 2005, in connection with the development of the 60.85-acre tract into a massive warehouse distribution facility, contractors operating on behalf of the Warehouse Development Interests, acting over Wright's immediate protests, breached and destroyed the hog wire fence claimed by Wright as the southern end of the common boundary, as well as another "zig-zag" fence and trees and other vegetation in the roughly triangular-shaped disputed area. Wright filed suit immediately against VFL, and sought injunctive relief, ejectment, and trespass damages. The court granted a temporary restraining order preventing further cutting or alterations, but, following an evidentiary hearing on November 21, 2005, the court dissolved the temporary order and denied an interlocutory injunction. The court made a preliminary finding that the entire disputed area was part of VIF's property.[2] The court held, therefore, that "there is not sufficient prospective irreparable damage to warrant the issuance of an interlocutory injunction." The court ruled that Wright had an adequate

---

[1] Dr. Valentine also signed the Limited Warranty Deed from PCP to VFL as the president of the general partner of PCP.

[2] The court made clear, however, that the order "[did] not constitute a final judgment on the merits of any claim made by the parties in this action. Plaintiff and Defendant retain the right to present evidence as to title to the disputed property in accordance with Georgia law."

remedy at law — damages. Finally, the court forbade Wright from disturbing the disputed area:

> During the pendency of this action, the Court hereby ORDERS that the parties adhere to the following guidelines . . . [Wright] shall not traverse across or otherwise disturb Defendant's property, which is deemed to encompass, for purposes of this Order, the disputed property.[3]

In October 2007, Wright dismissed the action without prejudice but refiled on December 28, adding claims and defendants. He sued all three Warehouse Development Interests, as well as PCP, and Dr. Valentine.[4] Wright alleged that after VIF acquired the property from VFL, it continued to grade, backfill, and improve the disputed property, eventually building a warehouse that encroaches upon his property.[5] Wright later added the end user/current occupant of the property — First Industrial Investment, Inc., to which VIF had conveyed the relevant tract on December 28, 2007, after the second lawsuit was filed.[6] Wright alleged that First Industrial was continuing the "trespassory actions" of its predecessors in title. Finally, Wright alleged that Dr. Valentine and PCP were equally liable for the trespasses even though they had sold the property before the trespasses occurred.

Dr. Valentine and PCP moved for summary judgment on the ground that they were not the alleged actual trespassers, that they had relinquished title and control of the property before the trespass, that the alleged actual trespassers were not their agents, and that they could not be liable for the actions of their successors in title. The trial court agreed and granted summary judgment in their favor on May 14, 2009. On appeal, Wright contends the trial court failed to follow controlling precedent and that it rendered "gratuitous findings on disputed material facts. . . ."

Wright argues that the movants are subject to liability under *Whitaker Acres v. Schrenk*, 170 Ga. App. 238 (316 SE2d 537) (1984).

---

[3] The court described the disputed property as the portion of land lying between the last 470.14 feet of the boundary asserted by the appellees as shown in a certain survey, "and the jagged fence running onto and across the southeastern corner of Defendant's property on the same survey."

[4] Dr. Valentine died on January 6, 2009, during the second suit, and his estate was substituted as a party in his place.

[5] In their answer, the Warehouse Development Interests asserted, among other things, that title of the disputed area had, alternatively, been acquired by adverse possession.

[6] The associated limited warranty deed included a "Permitted Exception" of "Adverse rights now or hereafter claimed by J. B. Wright as evidenced by [the Original Action,] now dismissed."

In that case, Whitaker Acres, Inc. sold the same property twice, allegedly because of an inadvertent oversight. After the second purchaser graded and excavated the property, Schrenk, the first purchaser, brought suit against the second purchaser and against Whitaker Acres, which argued that it could not be liable because the second purchaser caused the trespass. Id. at 239 (1). This Court held that Whitaker Acres was subject to liability for trespass based on the following law:

> "One who procures or assists in the commission of a trespass, or does any act which ordinarily and naturally induces its commission, is liable therefor as the actual perpetrator." *Burns v. Horkan*, 126 Ga. 161 (3) (54 SE 946) (1906). Where the trespass results as the consequence of a conveyance purporting to grant an interest in the property to the actual trespasser, "the maker of the instrument might be sued in trespass, because 'he is the causa causans, the prime mover of the damage to the plaintiff.' . . . the maker (is) liable in trespass with the actual perpetrator, upon the theory that the maker has put in motion the thing which subsequently induced the party to commit the trespass. The execution of the conveyance amounts to an assertion of the maker's right to use the property, and is equivalent to counseling and directing the grantee or lessee to commit the trespass." *Burch v. King*, 14 Ga. App. 153, 156 (80 SE 664) (1913).

Id.

In this case, the trial court held that Wright's reliance on *Schrenk* amounted to a "misreading and overextension" of that decision. The court contended that Wright relied on the theory that "a grantor, by that status alone, may *ipso facto* be held liable in tort for the trespasses of his grantee (or subsequent grantees)." But Wright did not rely on the simple fact that Dr. Valentine and PCP were merely the predecessors in title to the actual trespassers, and *Schrenk* does not stand for this proposition. Rather, as shown below, Wright presented unrebutted allegations and evidence that, when construed in his favor for purposes of summary judgment, create an issue of fact as to whether Dr. Valentine and PCP knew or should have known that there were disputes regarding the lines and corners of the southeast corner of the property, both when Dr. Valentine sold his property to PCP and when PCP sold it to VFL, including that it did not include a small sliver of land, part of the disputed property, located right along the boundary with Wright's property. Thus an issue of fact was raised as to whether Dr. Valentine and PCP knew or

should have known that they were conveying property that did not belong to them. Selling property that one does not own to others who then trespass on that land is the basis for liability established in *Schrenk*. The fact that Dr. Valentine swore in the April 2005 Seller's Affidavit that the lines and corners were not in dispute merely creates an issue of fact in this regard.

First, Wright alleged that his father and he have had record title to the disputed area since 1940 through their own chain of title. Other than surveys of the Valentine property prepared on behalf of Dr. Valentine and the subsequent owners of his property, all of which allegedly include a critical error, we find no evidence that the appellees have pierced this allegation regarding Wright's record title. So at a minimum, with regard to the disputed property, Wright has alleged a "claim of right" — i.e., "some claim of title in the sense that the possessor claims the property as his own." (Citation and punctuation omitted.) *Simmons v. Community Renewal and Redemption*, 286 Ga. 6 (1) (685 SE2d 75) (2009).

Second, Wright has consistently testified that there has never been a fence south of the beech tree stump along the straight line asserted as the boundary by the Valentines. Moreover, Wright has testified that for many years, including at the time Dr. Valentine acquired his property, he and his father openly and notoriously cleared and cultivated at least part of the disputed area and that, in the 1990s, he dug a drainage ditch on part of the disputed area, all without any permission from Dr. Valentine or PCP. And even Dr. Valentine alleges that Wright tore down the alleged Valentine fence without asking permission. Finally, the property corner claimed by the appellees, which was newly established when PCP subdivided its property, falls in the field cultivated by Wright. Thus, there is an issue of fact as to whether Valentine and PCP were on notice of an adverse claim by Wright to the disputed area. See generally *Simmons*, 286 Ga. 6 (1) (adverse possession claimant "must show possession not originated in fraud that is public, continuous, exclusive, uninterrupted and peaceable, and accompanied by a claim of right"); *McDonald v. Taylor*, 200 Ga. 445, 451-452 (1) (37 SE2d 336) (1946) (regarding evidence required to put one on notice of an adverse claim).

Third, in 1969, shortly after acquiring his property, Dr. Valentine quitclaimed to Liza Wright 7.38 acres of land, including part of the area in dispute in this case, located on what Dr. Valentine considered to be his side of the property line. Dr. Valentine's property was resurveyed following this devise, and the new survey reflects the loss of the 7.38 acres; it also shows a different direction on the final survey call in the disputed area. Later, when Liza Wright passed away, Dr. Valentine attempted to purchase her property, including

the 7.38 acres. But, allegedly because of another error, he allegedly failed to purchase a small portion of the property located along the Valentine-Wright boundary. And there is no evidence that Dr. Valentine or PCP ever reacquired that portion of the property. Yet PCP purports to have sold this land to the Warehouse Development Interests based on a resurvey of the boundary line. Highlighting this point, the Warehouse Development Interests now claim this sliver of land both by conveyance and, in the alternative, by way of Dr. Valentine's and their own adverse possession of this area, "particularly, that sliver." Moreover, the various surveys obtained by either Dr. Valentine or PCP show the last survey call for the boundary in at least three different positions, some ending at an iron pin and one not doing so.

In summary, construed in favor of Wright, there is some evidence that Dr. Valentine and PCP sold land that they did not own. Liability can attach regardless of whether Dr. Valentine and PCP relied on professional surveys. Although reliance on a survey may eliminate a claim of wilful trespass and punitive damages, it does not absolve the trespasser from damages for trespassing on his neighbor's property. See *Lanier v. Burnette*, 245 Ga. App. 566, 570 (3) (538 SE2d 476) (2000) (defendant liable although he used surveyor to determine where to build fence). See also *Page v. Braddy*, 255 Ga. App. 124, 126 (564 SE2d 538) (2002) (person causing trespass liable even though he believed himself to be the owner of the land as a result of a surveyor's mistake).

Accordingly the trial court erred by granting summary judgment in favor of Dr. Valentine and PCP.

2. Wright contends the trial court erred with regard to both spoliation orders. He contends there was no competent evidence to support the court's findings; that the trial court abused its discretion in finding him guilty of spoliation; and that the court abused its discretion with regard to the sanctions awarded. "Spoliation refers to the destruction or failure to preserve evidence that is necessary to contemplated or pending litigation." (Footnote omitted.) *Bridgestone/Firestone North American Tire v. Campbell*, 258 Ga. App. 767, 768 (574 SE2d 923) (2002). "Where a party has destroyed or significantly altered evidence that is material to the litigation, the trial court has wide discretion to fashion sanctions on a case-by-case basis." *AMLI Residential Properties v. Ga. Power Co.*, 293 Ga. App. 358, 361 (667 SE2d 150) (2008). "Moreover, we will uphold a trial court's finding of wilful discovery abuse if there is any evidence to support it." *Bouvé & Mohr, LLC v. Banks*, 274 Ga. App. 758, 762 (1) (618 SE2d 650) (2005).

(a) The claim of spoliation arose during the renewed action. On March 22, 2008, during the pendency of the second action, Wright

was seen using a backhoe in the disputed area; moving dirt; and hauling hog wire fence to a debris pile.

Following a hearing on the claim of spoliation, the court found that Wright had been ordered, in the first action, not to disturb the disputed area, which placed him on notice that destruction of evidence was prohibited; that Wright disturbed the area; that First Industrial was served with process in the action after the spoliation; that Wright knew that the existence and location of the hog wire fence asserted by the appellees, as well as the existing vegetation and natural features and contours of the property, were important evidence regarding the boundary dispute; that Wright's actions were wilful and intentional; that First Industrial was prejudiced because it did not have an opportunity after being sued to inspect the property; and that the prejudice to First Industrial could not be cured.

In a separate order, the court made similar findings with regard to the Warehouse Development Interests. In addition to those mentioned above, the court found that removal of any hog wire fence from the disputed area would be crucial to the case; that alteration of the physical features of the property was also relevant to the Warehouse Development Interests' claim of adverse possession; that Wright removed hog wire fence from the area near the border as well as underbrush and vegetation; and that the Warehouse Development Interests were prejudiced as a result.

The evidence shows that Wright admitted working in part of the disputed area[7] and admitted that his activities were contrary to the court's order in the original action forbidding him from disturbing that area. He contends that his testimony showed that he did not alter the area in a significant manner and that he did not alter material evidence. But the appellees presented evidence and admissions by Wright to show that he was carrying hog wire fence in the backhoe; that tracks from the backhoe showed it had driven across the disputed area; that Wright was putting hog wire fence in a debris pile along with other hog wire fence taken from other locations; that there had been a hog wire fence along Valentine's asserted property line at some time in the past; and that Wright may have buried part of that fence in the 1990s. Further, Wright has acknowledged in an affidavit that he learned as early as November 2005 that the defendants claimed there used to be a fence along their asserted line and that he had buried it.

---

[7] Wright admitted that he was in the disputed area with the backhoe digging in a 70-foot area where a ditch is located, in another grassy area in the disputed area, and in a third place in the disputed area where he removed a beaver dam. He also admitted that he put some hog wire fence in a nearby debris pile along with the debris from digging in the ditch.

Accordingly, there was some evidence supporting the trial court's order. It was the trial court's job to resolve issues of fact regarding the hotly contested issue of spoliation, and we cannot conclude that the finding of spoliation was clearly erroneous.

(b) With regard to the remedies fashioned by the court, we also find no abuse of discretion. As a sanction for spoliation, the trial court dismissed all claims against First Industrial; with regard to the Warehouse Development Interests, it ordered that the jury be instructed as to a rebuttable presumption that the existence of the underbrush, vegetation and hog wire fence would have been harmful to Wright in connection with the Warehouse Development Interests' defenses. Trial courts have wide latitude to employ remedies such as these, "on a case-by-case basis, considering what is appropriate and fair under the circumstances." (Punctuation and footnote omitted.) *Wal-Mart Stores v. Lee*, 290 Ga. App. 541, 545 (1) (659 SE2d 905) (2008).

Wright argues that the court abused its discretion because (1) the defendants already had the opportunity to examine the disputed property during two-and-a-half years of litigation because they were in possession and control of the area; (2) none of the appellees had ever suggested that there was a hog wire fence on the relevant section of their asserted boundary line; (3) his own "innocent" activities on the disputed property were caused by the appellees' activities on the same property; (4) First Industrial "was the least sympathetic party from the standpoint of any latent equities . . ." in part because First Industrial bought the property "with its eyes wide open"; (5) First Industrial had owned the land for six months before the alleged spoliation yet failed to inspect the property or dig for old alleged hog wire fencing; and (6) the entire lawsuit began with a massive act of deliberate spoliation by the appellees of the boundary fence claimed by Wright, and that, therefore, it is unfair to penalize him so harshly for his minor actions in the disputed area.

The applicable law provides:

> [W]hen key evidence has been destroyed, exclusion of evidence or dismissal of a case may be warranted. In determining whether such a severe sanction is warranted, the trial court must consider: (1) whether the defendant was prejudiced as a result of the destruction of the evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the plaintiff acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence was not excluded.

444

(Footnotes omitted.) *Bridgestone/Firestone*, 258 Ga. App. at 768-769.

Wright's own affidavit shows that he knew in 2005 that the appellees contended that a fence existed along their asserted line and that he had buried it. Wright was also on notice not to disturb the disputed area. And the court found that a hog wire fence had existed along the appellees' asserted boundary at some point in the past. Yet, on May 22, 2008, Wright intentionally disturbed the area and removed pieces of hog wire fence and caused other changes that could not be cured. The court considered the critical nature of the spoliated evidence — evidence of a fence supporting appellees' claims and evidence of adverse possession of the disputed area. The court distinguished the effect on First Industrial from the effect on the Warehouse Development Interests. The court considered that First Industrial purchased the property in December 2007 with notice of the "adverse rights now or hereafter claimed by J. B. Wright," but that it was not served in the suit until May 27, 2008, five days after the spoliation events. The court considered that the Warehouse Development Interests had been involved in the litigation and the corresponding discovery for some time and therefore had more of an opportunity to develop their case than First Industrial. Accordingly, the court chose different remedies for each.

We conclude the trial court properly considered the relevant requirements for applying sanctions and weighed the prejudice to the defendants against Wright's culpability. We conclude that the court imposed sanctions which correspond to its findings. We therefore find no abuse of discretion. See generally *Wal-Mart*, 290 Ga. App. at 542 (1).

*Judgment affirmed in part and reversed in part. Ellington, C. J., and Mikell, J., concur.*

DECIDED MARCH 16, 2011 — 

*George E. Butler II, John T. Brown*, for appellant.

*Smith, Gilliam, Williams & Miles, Steven P. Gilliam, Roger B. Hatcher, Jr., Orr, Brown & Johnson, E. Wycliffe Orr, Sr., Spence Johnson, McLain & Merritt, M. David Merritt, Blasingame, Burch, Garrard & Ashley, E. Davison Burch, Thomas F. Hollingsworth III*, for appellees.