**FIRST DIVISION
BARNES, P. J.,
MCMILLIAN and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**March 15, 2018**

# In the Court of Appeals of Georgia

A17A1791. REID v. WASTE INDUSTRIES USA, INC. et al.

McMILLIAN, Judge.

After Hans G. Reid was acquitted of charges stemming from his alleged brandishing of a gun on his supervisor and co-workers after he was fired, Reid filed this civil action for malicious prosecution, conspiracy, and intentional and negligent infliction of emotional distress against his employer and the employees who made the charges against him.[1] Reid appeals from the trial court's orders granting defendants' motion for summary judgment on these claims and from the order denying his motion

---

[1] This is the second appearance of this case before this Court. In the previous appeal, docketed as Case No. A17A0169, we remanded for a determination of whether the record should be supplemented with the transcript and exhibits from Reid's prior criminal trial. The trial court authorized supplementation of the record, and the record was supplemented and the case was redocketed in this Court as directed in our prior order.

for sanctions. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

"Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant." (Citation omitted.) *Elder v. Hayes*, 337 Ga. App. 826, 827 (788 SE2d 915) (2016).

So viewed in Reid's favor, the evidence shows that in June 2012, Reid was employed by appellee/defendant Waste Industries Atlanta, LLC ("Waste Atlanta") as a recycle waste truck driver at its Douglasville, Georgia plant ("Douglasville plant"). During this time, Reid and other employees were having discussions about forming a union, and management had allegedly become aware of those activities. Carlos Pichardo, who at that time was the Operations Manager at the Douglasville plant, averred that in May 2012, Waste Atlanta's General Manager Tony J. Gouldthorp and regional manager Richard Johnson, made it clear that Reid needed to be terminated immediately because of his union activities.[2]

---

[2] Gouldthorp subsequently testified under oath that he never told anyone that Reid was trying to start a union and he wanted to stop him.

2

According to Pichardo, he then took a series of steps to find instances where Reid had violated company rules. These efforts were unsuccessful and, in fact, Pichardo discovered that Reid had received a satisfactory rating on his last performance evaluation, which had been conducted in April 2012, and had been given a pay increase as a result of his rating of 4.5 out of 5. Pichardo averred that he was eventually instructed by Gouldthorp to adjust the sensitivity of Reid's onboard dash camera so that it would be more likely to record mistakes, and approximately two weeks later, it was detected that the visor in Reid's truck was blocking the onboard camera. Pichardo said at that point he was directed to immediately terminate Reid and to fabricate two additional write-ups so it would appear that Reid had been given similar warnings in the past since company policy required three warnings prior to termination.

At the end of Reid's shift on June 20, 2012, Pichardo escorted Reid to Gouldthorp's office, where Gouldthorp, Maintenance Manager Mike Harrington, and Winn Bearden, a manager from an affiliated entity, were waiting in Gouldthorp's office for Reid. Unbeknownst to the others, Harrington activated the audio on his cell phone and recorded what happened next. Gouldthorp told Reid that he was being terminated for violating the onboard camera policy, and when Reid began to question

3

it said the decision was final. Ignoring instructions that he leave, Reid insisted on retrieving items from the company truck he had driven that day and can be heard saying that he knows he is being terminated because of his union activities.

After he went to his truck, Reid went back into the building to get his personal effects out of his locker, at which time he was again advised to leave and further advised he was illegally breaking into the building and that the police would be called. Reid proceeded to his locker and then headed back out of the building. On his way out, Reid and Harrington exchanged words, and Reid pulled his fist as if to strike Harrington and made a remark about kicking Harrington's "fat ass." Even Harrington testified,[3] however, that he believed Reid's actions were meant to intimidate him and he did not intend to make contact.

Reid continued walking to the employee parking lot, where he had parked in his usual spot near the surveillance cameras. What happened next is at the heart of the issues in this case. Reid then walked to the trunk of his car and retrieved several items out of the back, including a handgun, for which he had a permit and which he normally kept in his car during work. According to Reid, he had placed the gun in his trunk while he went back inside to talk to the managers, but he took it out to place it

[3] This testimony was given at Reid's subsequent criminal trial.

4

under his car seat because he was afraid it could accidentally discharge if it was unsecured in the trunk. Reid said that although he and Gouldthorp were still exchanging words, he kept his gun pointed down by his butt while he walked to the door on the driver's side, got in his car, placed his gun under his seat, and drove away.

The defendant managers can be heard saying on the audio tape that Reid has a gun, and Harrington called 911. According to Pichardo, before the police arrived, the men talked about what they would tell the police when they arrived, and Gouldthorp told the men to be sure to say that Reid pointed the gun at them and threatened them. Deputy Charles Sharpe of the Douglas County Sheriff's Department responded to the 911 call. According to Deputy Sharpe, Gouldthorp informed him that Reid had been terminated but then refused to leave the premises and that after finally walking to his vehicle, Reid had retrieved a gun and pointed it at Gouldthorp's face, stating words to the effect that he had his number or had something for him. Deputy Sharpe also said that Gouldthorp told him that before leaving the premises, Reid had pointed the gun at the other three men, one at a time, and told them he had something for them too.

Deputy Sharpe directed the men to write individual statements of the incident, and each of the men confirmed that Reid had pointed a gun at them, except for Pichardo who wrote in his statement that he saw Reid with a gun but did not say that he pointed it. Around the time the statements were being prepared, Harrington informed Deputy Sharpe that he had made a recording of the incident, and Deputy Sharpe inquired as to whether the recording was video or audio. Harrington replied that it was only audio and added that he wished he had a video of the incident. Deputy Sharpe told Harrington that next time he made an audio recording he should also make a video and instructed him to save the recording. According to Deputy Sharpe, Gouldthorp was "present and engaged" in this conversation.

Based on the information provided to him, Deputy Sharpe issued a "be on the lookout" for Reid and gave police dispatch Reid's home address. Reid was arrested later that evening at his residence, and he was subsequently charged with four counts of aggravated assault based on "pointing a handgun" at each of the defendant managers and four counts of terroristic threats.[4] The State ultimately nolle prossed the

---

[4] According to his affidavit, Reid spent 43 days in custody, during which time he was attacked on multiple occasions by other inmates and suffered extreme weight loss and illness. Because of the nature of the charges against him, Reid was also required to undergo a psychiatric evaluation before being considered for a bond.

6

terroristic threat charges, and in late September 2013, Reid was tried on the four counts of aggravated assault.

During Reid's criminal trial, Gouldthorp, Harrington, and Bearden testified for the State that Reid had pointed a gun at them or in their direction while making threatening remarks. Harrington's audio recording of the incident was also played for the jury at trial.

Deputy Charles Sharpe testified that his entire knowledge of the incident was based on what the managers told him about Reid pointing the gun. Deputy Sharpe testified that approximately a week before trial, he learned that the incident would have been recorded by a surveillance camera in the lot where Reid was parked and that he wished he had asked about the video because if he had, he might not be sitting at the trial.[5] Gouldthorp testified that he knew there was a surveillance video directed toward the parking lot, but he did not think about pulling the video at the time of the incident. He said the video was requested about three weeks later, but by that time it had been recorded over in the regular course of business.

Following the presentation of the State's case, Reid made a motion for directed verdict, which the trial court denied.

---

[5] Deputy Sharpe made similar statements in his affidavit presented in this case.

Pichardo testified on Reid's behalf.[6] Pichardo testified that he saw Reid with a gun after he went to his truck, that everyone panicked and said to call 911 but that he never saw Reid point the gun at anyone and although he heard him yell at Gouldthorp as he was driving away, he could not hear what he said. He also said they rehearsed what they would say after they called 911 and that Gouldthorp told them to be sure they wrote in their statements that Reid pointed a gun at them and threatened them.

Pichardo was questioned about the surveillance video on cross-examination. He conceded that he did not tell the officer that there was a camera in the area that would have recorded the incident, but he said he did not bring it up earlier because he was never asked. He also testified that he saw Gouldthorp looking at the video after the incident, but he personally did not view it.

Reid testified in his own defense at trial. He admitted he was upset by the firing, which he believed was because of his union activities. He admitted to throwing a fake punch at Harrington and telling him he wanted to beat his "fat ass," but said he was steadily walking away as he said it. Reid also admitted that he took the gun

---

[6] Pichardo testified that he was terminated from Waste Atlanta after he testified at Reid's bond hearing that Reid did not point, waive, or threaten anyone with a gun.

out of his trunk but said that he was just putting it back under his seat and that he never pointed the gun at anyone.

Based on this and other evidence presented at the criminal trial, the jury returned a not guilty verdict on all counts.

Subsequently, Reid complained to the National Labor Relations Board ("NLRB") about his firing, and in January 2013, the NLRB asserted a complaint alleging Waste Atlanta violated 29 USC § 158 based on discrimination against Reid and his termination for engaging in union activities. Pursuant to a settlement agreement dated April 11, 2014, Reid received $25,780 in backpay and interest to settle his claim.

A few months later, on June 19, 2014, Reid filed his complaint in the present case against Waste Atlanta, Bearden, Gouldthorp, Harrington, Pichardo, Johnson, and others for malicious prosecution, conspiracy, and intentional and negligent infliction of emotional distress. The trial court denied Reid's request for spoliation sanctions and granted defendants' motions for summary judgment on all claims. This appeal followed.

1. We first address appellees' contention that the trial court's orders granting summary judgment should be affirmed under the "right for any reason" rule because Reid's claims in the present action were barred by the settlement in his NLRB case.

The NLRB settlement contained the following provision:

**SCOPE OF THE AGREEMENT** – This Agreement settles only the allegations in the above-captioned case, and does not settle any other case or matters. It does not prevent persons from filing charges, the General Counsel from prosecuting complaints, or the Board and the courts from finding violations with respect to matters that happened before this Agreement was approved regardless of whether General Counsel knew of those matters or could have easily found them out.

The trial court found all claims relating to the termination of Reid's employment, including Reid's conspiracy claims to the extent he asserted the appellees conspired to fire him, were resolved by the NLRB settlement. However, the trial court distinguished Reid's other claims finding that the "instant case relates to the events that followed the termination." Although appellees now challenge that determination and urge we rule in their favor by finding Reid's claims in the instant case are also barred by the NLRB settlement, they failed to file a cross-appeal from the trial court's adverse ruling on that issue. Accordingly, this issue is not properly before us, and we decline to affirm on this basis. OCGA § 5-6-58 (a); *Bath v. Intl.*

10

*Paper Co.*, 343 Ga. App. 324, 331 (2) (807 SE2d 64) (2017) ("failure to file a cross-appeal from [an] adverse ruling means we cannot reach this issue.); *Truelove v. Buckley*, 318 Ga. App. 207, 212 (2) (733 SE2d 499) (2012) (same).

2. We next turn to Reid's contention that the trial court erred by granting summary judgment on his claim for malicious prosecution. We agree that material questions of fact remain for a jury to resolve on this claim.

To prevail on a claim for malicious prosecution, a plaintiff in Georgia must show

> (1) prosecution for a criminal offense; (2) instigated without probable cause; (3) with malice; (4) under a valid warrant, accusation or summons; (5) which has terminated favorable to the plaintiff; and (6) which has caused damage to the plaintiff. The requisite malice may be inferred from a total lack of probable cause. Thus, the gravamen of the complaint is the absence of probable cause on the part of the person instituting the prosecution.

(Citation and punctuation omitted.) *McKissick v. S. O. A., Inc.*, 299 Ga. App. 772, 774 (1) (684 SE2d 24) (2009); *Turnage v. Kasper*, 307 Ga. App. 172, 179 (b) (i) (704 SE2d 842) (2010).

Here, the trial court properly determined that Reid had clearly satisfied the first, fourth, fifth, and sixth elements. However, the trial court went on to find that the

11

denial of Reid's motion for directed verdict at the criminal trial constituted a binding determination of probable cause in the absence of fraud or corruption in procuring the denial. E.g., *Monroe v. Sigler*, 256 Ga. 759, 761 (4) (353 SE2d 23) (1987); see also *Akins v. Warren*, 258 Ga. 853, 854 (2) (375 SE2d 605) (1989); *Wolf Camera v. Royter*, 253 Ga. App. 254 (558 SE2d 797) (2002). Although the trial court took note of Reid's argument that the defendants provided information they knew to be false to the police, which could support a finding of fraud, the court dismissed that argument by finding that even if Reid was not guilty of pointing a gun at the defendant managers, his conduct was such that "there was probable cause for [his] arrest for an assortment of [other] crimes that day," and therefore summary judgment on his malicious prosecution claim was proper. This was erroneous.

The question of whether there was probable cause for prosecution of an offense in the context of a malicious prosecution or arrest claim turns on whether there were facts supporting the crime the plaintiff was charged with committing based on information provided to police by the defendant, not whether the plaintiff was possibly guilty of some other crime. See *Willis v. Arnett*, 306 Ga. App. 503, 506 (702 SE2d 646) (2010) ("The determination [of probable cause] is dependent upon whether the facts as they appeared at the time of instituting the prosecution were such as to

12

lead a person of ordinary caution to entertain a belief that the accused was guilty of the offense charged."). In other words, if the defendant lied or exaggerated to the police about an essential element of the crime for which the plaintiff is subsequently arrested or prosecuted, it may be that there is no probable cause. See *Turnage*, 307 Ga. App. at 181-82 (1) (b) (ii). As we held in *McKissick*, "It follows that no probable cause exists if a defendant knew that the facts stated to the law enforcement official were false or if he failed to make a fair, full, and complete statement of the facts as they existed, or if he concealed facts." *McKissick*, 299 Ga. App. at 775 (1).

In this case, there is no question the defendant managers' statements to police that Reid pointed a gun at them while making threatening remarks was the entire basis for the aggravated assault charges for which he was prosecuted since the police did not conduct any independent investigation beyond taking the defendants' statements. And, there is no question in this case that the decision to prosecute Reid for the *particular* crimes charged in the indictment was based entirely on the defendant managers' statements to police since their statements were the only evidence that Reid pointed a gun at each of them. See *Turnage*, 307 Ga. App. at 180 (1) (b) (i) ("A person may be held liable for malicious prosecution when he provides information to an investigating officer that he knows to be false, and in doing so

unduly influences the authorities to take the complained of actions."). Because genuine issues of fact exist as to whether Reid's prosecution for aggravated assault as charged in the indictments was based on statements which were untrue or incomplete, we conclude the trial court erred by granting summary judgment on Reid's claim for malicious prosecution. *Wolf Camera*, 253 Ga. App. at 258-59 (1) (b) (although motion for directed verdict denied in plaintiff's criminal trial, jury authorized to find lack of probable cause when evidence presented that such denial was obtained through fraud–specifically that defendants acted in unison to frame the plaintiff and conceal exculpatory evidence).

3. Reid also challenges the grant of summary judgment on his conspiracy claim. To the extent that the trial court granted summary judgment based on a finding that his conspiracy claim failed because it was dependent on Reid's malicious prosecution claim, the trial court must be reversed in light of our holding in Division 2. Further, viewed in Reid's favor as the party opposing the motion for summary judgment, a material issue of fact remains as to whether the defendants conspired to

14

have Reid prosecuted for a crime he did not commit.[7] *Turnage*, 307 Ga. App. at 179

(1) (a). Accordingly, summary judgment on this claim is also reversed.

4. We next turn to Reid's claim for intentional infliction of emotional distress.

Four elements must be present to support a claim of intentional infliction of emotional distress: (1) The conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe.

(Citations and punctuation omitted.) *Sevcech v. Ingles Mkts.*, 222 Ga. App. 221, 223

(3) (474 SE2d 4) (1996).

The trial court granted summary judgment on Reid's claim for intentional

infliction of emotional distress, finding that defendants' conduct of calling 911 to

report that Reid had pulled out a gun while making threats did not rise to the

---

[7] Appellees contend that Reid's evidence of a conspiracy is based solely on Pichardo's statements that the defendants managers rehearsed their statements to police and that he saw them watching a video of the events shortly after the incident, and that we should disregard this evidence under the contradictory testimony rule set out in *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27 (343 SE2d 680) (1986). However, even assuming that Pichardo's affidavit averments and trial testimony were contradictory, which we do not find, *Prophecy* applies to the self-contradictory testimony of a party on their own behalf. See *Thompson v. Ezor*, 272 Ga. 849, 851 (1) (536 SE2d 749) (2000); *Jones v. Med. Center of Central Ga., Inc.,* 341 Ga. App. 888, 894 (4) (802 SE2d 286) (2017). Here, Pichardo's testimony was in support of Reid's position, the opposing party in this action.

15

necessary level of extreme and outrageous conduct.[8] We might agree with that conclusion if defendants had simply called 911 and reported that Reid had a gun. However, Reid presented evidence that defendants discussed what they would tell police so as to emphasize that not only did he have a gun but that he pointed the gun at each of them, and they never backed down from this claim even after viewing a video of the incident which they chose not to provide to police.[9] "When evaluating whether the objected-to conduct can reasonably be characterized as outrageous or egregious, a jury may consider evidence of a defendant's malicious purpose or wanton disregard of a plaintiff's rights." *K-Mart Corp. v. Lovett*, 241 Ga. App. 26, 29 (3) (525 SE2d 751) (1999).[10]

---

[8] The trial court also noted that Reid did not seek mental health treatment after these events. But Reid was subsequently incarcerated for 43 days and presented evidence of the emotional distress he suffered while incarcerated.

[9] Defendants averred that they never viewed the video of the incident, while Pichardo testified and averred that he saw one or more of the managers viewing the video. This creates a disputed issue of fact for a jury to resolve.

[10] Although appellees point out that this case, which Reid cites in his brief on appeal, involves review of a jury trial not a ruling on motion for summary judgment, the standards of review are not so different as to entirely vitiate the usefulness of the opinion to our analysis.

Also, because police believed that Reid had pointed a gun at coworkers while making threats, he was kept in jail for 43 days, during which time he was attacked by inmates, became ill, and had to undergo a psychiatric examination to be considered for release, all of which could cause the type of extreme emotional distress necessary to sustain his claim. Yet the defendants did nothing to seek an end to Reid's incarceration, despite allegedly having evidence in their possession that could have shown he did not actually point the gun at anyone. Viewing the evidence and inferences in Reid's favor, reasonable persons could find that Reid suffered severe emotional distress resulting from defendants' extreme and outrageous conduct, and the trial court erred by granting summary judgment on this claim. *Blockum v. Fieldale Farms Corp.*, 275 Ga. 798, 801 (3) (573 SE2d 36) (2002) ("If there is evidence from which reasonable persons can find severe emotional distress resulting from extreme and outrageous conduct, the issue is one for the jury."); *K-Mart Corp. v. Lovett*, 241 Ga. App. 26, 28 (3) (525 SE2d 751) (1999) (jury authorized to find intentional infliction of emotional distress when plaintiff was jailed for 24 days after defendants falsely accused her of shoplifting); *Sevcech*, 222 Ga. App. at 224 (3) (jury must determine whether defendants conduct was sufficiently outrageous to support claim for intentional infliction of emotional distress when defendants called police and had

plaintiff arrested for shoplifting despite the fact they found no evidence of stolen merchandise).

5. We reach a different result, however, on Reid's claim for negligent infliction of emotional distress. As our Supreme Court recently reiterated in *Coon v. Medical Center Inc.,* 300 Ga. 722 (797 SE2d 828) (2017), in the absence of pecuniary loss, three elements are necessary to prevail on a claim for negligent infliction of emotional distress: "(1) a physical impact to the plaintiff; (2) the physical impact causes physical injury to the plaintiff; and (3) the physical injury to the plaintiff causes the plaintiff's mental suffering or emotional distress." (Citation omitted.) Id. at 734 (4), n.8.

In support of his claim, Reed averred he suffered a physical impact while in jail when other inmates attacked him multiple times. However, as the trial court noted in its order granting summary judgment on this claim,[11] in general, an intervening criminal act of a third party is not the type of physical impact that will sustain a claim for negligent infliction of emotional distress. See *Clarke v. Freeman*, 302 Ga. App. 831, 837 (2) (692 SE2d 80) (2010); *Davis v. Blockbuster, Inc.*, 258 Ga. App. 677, 679

[11] The trial court noted that Reid's emotional distress damages could be recoverable as an element of damages for an underlying intentional tort, but found no separate intentional tort existed in this case because summary judgment had been granted on Reid's malicious prosecution claim. In light of our holding in Division 2, this determination must be reversed.

(1) (575 SE2d 1) (2002). Further, Reid has made no argument on appeal that the repeated attacks were reasonably foreseeable by the defendants. *Davis*, 258 Ga. App. at 679-80 (1). Accordingly, the grant of summary judgment on Reid's negligent infliction of emotional distress claim is affirmed.

6. Lastly, we turn to Reid's contention that the trial court applied the wrong legal analysis in denying his motion for sanctions based on spoliation of evidence.[12] As more fully set forth below, we now remand for further consideration of this issue.

Spoliation refers to "the destruction or failure to preserve evidence that is relevant to contemplated or pending litigation." *Phillips v. Harmon*, 297 Ga. 386, 393 (II) (774 SE2d 596) (2015). Such conduct may create the rebuttable presumption that the evidence would have been harmful to the spoliator. *Baxley v. Hakiel Indus., Inc.,* 282 Ga. 312, 313 (647 SE2d 29) (2007); see also *Phillips*, 297 Ga. at 394 (II). "However, in order for the injured party to pursue a remedy for spoliation, the spoliating party must have been under a duty to preserve the evidence at issue."

---

[12] Reid sought sanctions based on spoliation of the video recording of the gun incident, the video recording equipment on which the recording was made, and the maintenance records and vehicle condition reports of the Waste Atlanta truck he was driving when he allegedly blocked the drive cam. However, the drive cam evidence related to the wrongful termination, which has been settled. Further, appellees assert the video recording equipment is still available. Thus, we will confine our analysis to the failure to preserve the recording of the gun incident.

19

*Phillips*, 297 Ga. at 394 (II). In the case of a defendant, such duty arises when the alleged spoliator has actual or constructive notice that the plaintiff is contemplating litigation. *Sheats v. Kroger*, 336 Ga. App. 307, 310 (1) (784 SE2d 442) (2016).

"[A] trial court has wide discretion in adjudicating spoliation issues, and such discretion will not be disturbed absent abuse." (Citation omitted.) *Phillips v. Harmon*, 297 Ga. at 397 (II). Where a trial court makes findings of fact in ruling on a spoliation claim, this Court will uphold those findings if there is any evidence to support them, i.e., unless they are clearly erroneous. See *Sheats v. Kroger Co.*, 342 Ga. App. 723, 728 (805 SE2d 121) (2017). Even under this deferential standard, however, we cannot affirm a trial court's order based upon an erroneous legal theory. *Sheats*, 336 Ga. App. at 310 (1).

We start with the trial court's conclusion that it would be a "stretch" for defendants to anticipate, i.e., not reasonably foreseeable to them, that Reid would file this action for civil damages nearly two years after the June 20, 2012 incident, and consequently defendants had no duty to preserve evidence related to the incident.[13] However, we agree with Reid that the trial court did not properly consider the factors set out in *Phillips* in making this determination, including

---

[13] The present action was filed on June 19, 2014.

20

the relationship and course of conduct between the parties, including past litigation and threatened litigation; . . . [I]t may be appropriate to consider, . . . also what the defendant did or did not do in response to the injury, including the initiation and extent of any internal investigation, the reasons for any notification of counsel and insurers, and any expression by the defendant that it was acting in anticipation of litigation.

Phillips, 297 Ga. at 397 (II).

Here, the prior relationship of the parties included defendants' knowledge at the time the video was destroyed that Reid had been arrested, remained in jail, and would most likely be prosecuted for aggravated assault based on the defendant managers' statements to police that Reid pointed a gun at them while making threatening remarks. Deputy Sharpe made it clear to the defendant managers that a video recording of that incident would be an important piece of evidence to police, and defendants indicated at that time their awareness of the importance of the evidence and later confirmed they knew the evidence was important.[14] Further, the trial court failed to mention Pichardo's testimony that he saw Gouldthorp looking at the video before it was destroyed, a piece of information that would appear to be

_____

[14] For example, Gouldthorp agreed that had it been saved, the video would have been the most important piece of evidence at the trial.

critical in relation to the spoliation issue. See *Baxley*, 282 Ga. at 313-14. Although the trial court must decide if Pichardo's statements concerning the defendant managers' actions in regard to the video are credible in deciding whether spoliation sanctions should be imposed, we will not simply assume here that the trial court considered and disbelieved his account when the evidence appears to be of such critical importance and the trial court made no mention of it in the spoliation order.[15]

*Demere Marsh Assocs., LLC v. Boatright Roofing & General Contracting, Inc.,* 343 Ga. App. 235, 248 (4) (808 SE2d 1) (2017) ("In determining whether to impose sanction for evidence spoliation, trial courts routinely and necessarily make factual findings about whether spoliation occurred and fashions appropriate remedies."); *Wright v. VIF/Valentine Farms Bldg. One, LLC,* 308 Ga. App. 436, 443 (2) (a) (708 SE2d 41) (2011) ("It was the trial court's job to resolve issues of fact regarding the hotly contested issue of spoliation[.]")

---

[15] The trial judge, who also presided over the criminal trial, noted in the spoliation order that it did not have the benefit of the criminal trial transcript, which has now been transcribed, filed in the trial court, and made a part of the record on appeal. We also note that at the time the trial court decided the spoliation motion, it also did not have benefit of Pichardo's subsequent affidavit, in which Pichardo recounted events relating to the video in greater detail.

In sum, the trial court failed to consider certain important factors and evidence in analyzing Reid's spoliation claim. Accordingly, the order denying Reid's spoliation motion is hereby vacated and this case must be remanded for further consideration of that issue in light of this opinion.

*Judgment affirmed in part, reversed in part, and case remanded with direction. Barnes, P. J., and Mercier, J., concur.*